895 F.2d 1155
 22 Collier Bankr.Cas.2d 657, Bankr. L. Rep. P 73,274
In the Matter of James F. BONNETT and Linda J. Bonnett, Debtors.
Appeal of NATIONAL BANK OF PETERSBURG and Illinois National
Bank of Springfield.
 No. 87-2102.
 United States Court of Appeals,
Seventh Circuit.
 Submitted Dec. 1, 1989.*
Decided Dec. 20, 1989.
Opinion Feb. 13, 1990.**
 
 Donald R. Tracy, Tracy & Tracy, Springfield, Ill., for appellants.
 Charles K. Smith, Petersburg, Ill., for debtors-appellees.
 Before BAUER, Chief Judge, and EASTERBROOK and KANNE, Circuit Judges.
 KANNE, Circuit Judge.
 
 
 1
 This is an appeal of an order of the district court which reversed the bankruptcy court's determination that a debt was nondischargeable under 11 U.S.C. Sec. 523(a)(2)(B).[1] Because we find that the district court applied an improper standard of review, we reverse.
 
 BACKGROUND
 
 2
 James and Linda Bonnett (Bonnett) owned and operated Bonnett's Turkey Hatchery, Inc. in southern Illinois. In August, 1980, Bonnett approached the National Bank of Petersburg (NBP) for a $500,000 loan for the business. Since the loan request exceeded NBP's lending limit, NBP asked another larger bank, the Illinois National Bank of Springfield (INB) to participate in the loan. We will refer to these two lenders collectively as the "Banks."
 
 
 3
 Bonnett completed the usual loan applications, and he later forwarded the Banks a host of additional information which explained the history and operation of the hatchery. An uncertified financial audit was among these additional materials. Prior to reaching their loan decision, the Banks requested and received from Bonnett a certified audit, detailing substantially the same information as the uncertified audit they previously were furnished. Both of these audits were prepared by an independent accountant, W. Leon Jones, C.P.A. Based on this information, the Banks approved the loan on December 1, 1980.
 
 
 4
 On March 19, 1982, approximately sixteen months after the Banks made the loan to Bonnett, the hatchery sought reorganization under Chapter 11. Three months later on June 10, 1982, this filing was converted to a Chapter 7 proceeding. The Bonnetts declared personal bankruptcy under Chapter 7 on May 17, 1982, which initiated this adversary proceeding.
 
 
 5
 Banks usually do not make loans of this magnitude without a security interest in some tangible, marketable asset which is worth as much or more than the value of the loan. When the debtor defaults, the lender may force the sale of the collateral, and, in theory, is made whole. When default occurs and the sale of the collateral fetches substantially less than the lender expected, the lender often questions the appraisal. The lender may have been intentionally misinformed about the collateral's true value. 11 U.S.C. Sec. 523(a)(2)(B) provides an avenue whereby a lender can seek to declare a fraudulently obtained loan nondischargeable. In this case the Banks seek such a determination. In short, the subject of this appeal is the value of turkeys.
 
 I.
 
 6
 Under 11 U.S.C. Sec. 523(a)(2)(B), the party seeking the exception to discharge has the burden of proving, by clear and convincing evidence, all four statutory elements. In re Bogstad, 779 F.2d 370, 372 (7th Cir.1985). The bankruptcy court held that the Banks met this burden, and found the debt nondischargeable. Bonnett appealed, and the district court took exception as to one statutory element (reasonable reliance; 11 U.S.C. Sec. 523(a)(2)(B)(iii)) and reversed.
 
 
 7
 We review factual findings of the bankruptcy court under a clearly erroneous standard, but review conclusions of law de novo (Bankruptcy Rule 8013). Our review of the relevant facts extends not to the district court's decision, but to the findings of fact made by the bankruptcy court itself. In re First Wisc. Nat'l Bank, 849 F.2d 284, 286 (7th Cir.1988); In re Kimzey, 761 F.2d 421, 423 (7th Cir.1985). The clearly erroneous standard, however, does not permit a trier of fact to be overturned "simply because [the appellate court] is convinced it would have decided the case differently." Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). Instead, where two permissible conclusions can be drawn, the factfinder's choice cannot be clearly erroneous. EEOC v. Sears, Roebuck & Co., 839 F.2d 302, 309 (7th Cir.1988). Special deference must be accorded to credibility determinations "for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief of what is said." Anderson, 470 U.S. at 575, 105 S.Ct. at 1512.
 
 
 8
 The district court believed that Kimzey did not preclude de novo review of the issue of reasonableness, and properly noted the developing case law on reasonableness in a 11 U.S.C. Sec. 523(a)(2)(B) proceeding. In re Bogstad, 779 F.2d 370, 372-73 n. 4 (7th Cir.1985) (citing In re Blatz, 37 B.R. 401, 404-05 (Bankr.E.D.Wis.1984)), aff'd sub nom. Regency National Bank v. Blatz, 67 B.R. 88 (E.D.Wis.1986). This court, however, has held that a bankruptcy court's determination of dischargeability is subject to a clearly erroneous standard of review. In re Suttles, 819 F.2d 764, 765 (7th Cir.1987). Here, the bankruptcy court held two days of trial and was able to closely evaluate the witnesses' testimony. Absent an abuse of discretion, an appellate court should not attempt to redetermine the credibility of witnesses. In re Pearson Brothers Co., 787 F.2d 1157, 1162 (7th Cir.1986).
 
 
 9
 The reasonableness of a creditor's reliance should be determined on a case by case basis. In re Mullet, 817 F.2d 677, 679 (10th Cir.1987). Here, the Banks received both audited and unaudited statements from Bonnett. The unaudited financial statement Bonnett provided listed assets under two columns--"FAIR MARKET VALUE" and "HISTORICAL COST" (see Appendix I). End Note # 2 of the unaudited statement showed "the value of the breeding stock is the accumulated cost in the hens and toms." This unaudited statement was reviewed by the Banks at a meeting with Bonnett on October 9, 1980. During that meeting, the parties also discussed the turkey flock to be used as collateral. A representative of INB requested a certified audit be provided to supplement the unaudited statement already received.
 
 
 10
 A week after this meeting the Banks toured the hatchery. Bonnett provided another detailed packet of information shortly thereafter, and referred three times to the unaudited statement in the accompanying letter. On December 1, 1980, the Banks met again with Bonnett, and discussed the recently provided audited financial statement. The audited statement reflected a "breeder stock" value of $963,690, again reproducing end note # 2. No "fair market value" column was shown on the audited statement (see Appendix II).
 
 
 11
 The district court addressed the two bankers' testimony, and found they had fundamentally different definitions of "fair market value." The district court believed that since the two bankers could not agree as to what "fair market value" meant, a "red flag" should have been raised to question the value of the collateral. The Banks did not, in the district court's opinion, reasonably rely on the comparison of the audited and unaudited financial statements in determining whether to make their loan.
 
 
 12
 At trial, the bankruptcy court heard testimony from Jones, the CPA who prepared the statements. Jones testified that the audited statement reflected a sizeable typographical error (somewhere between $300,000 to $500,000). Jones testified at the original Chapter 11 proceedings that the value of the turkeys was approximately $400,000. In any event, there is little question that the turkeys were worth substantially less than the "fair market value" figure stated in the unaudited financial statement.
 
 II.
 
 13
 Courts should not be eager to intrude into the business practices of lending institutions. In re Bogstad at 373. We believe that even if the Banks' comparison of the financial statements should have raised "red flags," the bankruptcy court did not commit clear error in determining the Banks proved, by clear and convincing evidence, they reasonably relied on that comparison. This conclusion is bolstered by the fact that the Banks toured the facility and had numerous meetings with Bonnett. We do not believe that the current state of the law requires the Banks to seek a more detailed investigation under the circumstances, and the bankruptcy court did not misapply the law to the facts. Therefore, the judgment of the district court is
 
 
 14
 REVERSED.
APPENDIX I
TRIAL EXHIBIT # 22
BONNETT'S TURKEY HATCHERY, INC.
STATEMENT OF ASSETS,
LIABILITIES AND STOCKHOLDERS' EQUITY
June 30, 1980
(Unaudited)
ASSETS
 Fair Market Values Historical Cost
CURRENT ASSETS
 Accounts Receivable $ 76,239 $ 76,239
 Inventory
 Eggs 71,194 71,194
 Breeder StockNote 2 914,340 914,340
 Medication and Supplies 15,915 21,220
 Feed and Grain 42,874 42,874
 Federal Tax Refund 4,132 4,132
 Prepaid Insurance 2,317 2,317
 Total $1,127,011 $1,132,316
FIXED ASSETS--Note 3
 Land $ 286,800 $ 47,173
 Hatchery Building 222,000 71,741
 Hatchery Equipment 288,995 78,730
 Delivery Equipment 47,500 60,242
 Office Furniture & Fixtures 10,700 8,599
 Breeder Barn and Equipment 1,444,510 794,775
 Grower Equipment 351,600 233,743
 Farm Equipment 75,400 78,530
 1,373,643
 Less Accumulated Depreciation (388,075 )
 Total 2,727,505 985,568
OTHER ASSETS
 PCA StockNote 4 $ 18,566 $ 18,445
 InvestmentSubsidiary 10,000 100
 Other Investments 500 500
 Total 28,945 19,045
 ------------------- --------------------
 Total Assets $3,883,461 $2,136,929
-------------------------------------------------------------------------------
NOTE 2 The value of the breeding stock is the
 accumulated costs in the hens and toms.
 
 
 15
 APPENDIX II
TRIAL EXHIBIT # 5
BONNETT'S TURKEY HATCHERY, INC.
BALANCE SHEET
June 30, 1980
(Audited)
ASSETS
CURRENT ASSETS
 Accounts Receivable $ 55,163
 Inventory
 Eggs--Note 3 58,943
 Breeder Stock--Note 2 963,690
 Medication and supplies--Note 3 23,833
 Feed and Grain--Note 3 25,350
 Federal Tax Refund 4,132
 Prepaid Insurance 39
 ----------------------------------
 Total $1,131,150
FIXED ASSETS
 Land $ 47,173
 Hatchery Building 71,741
 Hatchery Equipment 117,275
 Delivery Equipment 60,242
 Office Furniture and Fixtures 8,599
 Breeder Barn and Equipment 493,638
 Grower Equipment 157,653
 Farm Equipment 39,937
 ----------------------------------
 Less Accumulated Depreciation (336,612 )
 Total 659,646
OTHER ASSETS
 PCA Stock--Note 4 $ 18,445
 InvestmentSubsidiary 100
 Other Investments 500
 ----------------------------------
 Total 19,045
 ----------------------------------
 Total Assets $1,809,841
 ----------------------------------
-------------------------------------------------------------------------------
NOTE 2 The value of the breeding stock is the
 accumulated costs in the hens and toms.
 
 
 
 *
 After preliminary examination of the appellant's brief, the court notified the parties that it had tentatively concluded that oral argument would not be helpful to the court in this case. The notice provided that any party might file a "Statement as to Need of Oral Argument." See Rule 34(a), Fed.R.App.P.; Circuit Rule 34(f). No such statement having been filed, the appeal has been submitted on the appellant's brief and record
 On October 7, 1987 this court issued a Rule to Show Cause to the appellee, directing counsel to respond as to why this appeal should not be decided without the filing of an appellee's brief and without oral argument pursuant to Circuit Rule 31(d). Having received no response, this case was submitted for decision per Circuit Rule 31(d) on November 20, 1987, without a brief of the appellee.
 
 
 **
 Pursuant to Circuit Rule 53, this opinion was originally issued as an unpublished order on December 20, 1989. The court, upon request, issues this decision as an opinion
 
 
 [1]
 The relevant portion of section 523(a)(2)(B) reads:
 (a) A discharge ... does not discharge an individual debtor from any debt--
 (2) for money ... obtained by--
 (B) use of statement in writing--
 (i) that is materially false;
 (ii) respecting the debtor's financial condition;
 (iii) on which the creditor ... reasonably relied; and
 (iv) that the debtor caused to be made or published with intent to deceive....