In re Thomas W. HICKLIN, and Christy Ray Hicklin, Debtors.

ARKANSAS ALUMINUM ALLOYS, INC., Plaintiff,

v.

Thomas W. HICKLIN, Defendant.

Civ. No. 90–1279–K.
Bankruptcy No. 89–11087.
Adv. No. 89–5205.

United States District Court,
D. Kansas.

Oct. 4, 1990.

J. Michael Morris, Klenda, Mitchell, Austerman & Zuercher, Wichita, Kan., for debtors.

Richard D. Ewy, Foulston & Siefkin, Wichita, Kan., for plaintiff.

MEMORANDUM AND ORDER

PATRICK F. KELLY, District Judge.

This matter is before the court on an appeal from the bankruptcy court. Appellant Dr. Thomas Hicklin (Dr. Hicklin) challenges the bankruptcy court's finding that his guaranty of a debt from Midwest Diecast, Inc. (Midwest Diecast) to appellee Arkansas Aluminum Alloys, Inc. (AAA) was not dischargeable pursuant to 11 U.S.C. § 523(a)(2)(B). More specifically, Dr. Hicklin claims the bankruptcy court erred in finding that AAA reasonably relied on the financial statement he submitted.

The court has thoroughly reviewed the parties' briefs and finds that oral argument is not necessary. D.Kan. Rule ·710(a)(7). In addition, as more fully explained herein, the court finds that the bankruptcy court's ruling that the debt was not dischargeable must be affirmed.

In reviewing the findings of the bankruptcy court, this court may set aside findings of fact only if they are clearly erroneous. *In re Branding Iron Motel, Inc.*, 798 F.2d 396, 399 (10th Cir.1986). Conclusions of law, however, are subject to *de novo* review. *In re Blehm Land & Cattle Co.*, 859 F.2d 137 (10th Cir.1988). In addition, mixed questions of law and fact are subject

to *de novo* review if such mixed questions involve "primarily a consideration of legal principles." *Matter of Tri–State Equipment, Inc.*, 792 F.2d 967, 970 (10th Cir. 1986).

In July of 1988, Midwest Diecast contacted AAA about purchasing aluminum ingot on credit. The two companies had not previously done business with each other. As a result, a sales representative of AAA, Charles Spicer, visited Midwest Diecast's facility. During such visit, Mr. Spicer obtained trade references from Midwest Diecast. Mr. Spicer later prepared and submitted Midwest Diecast's credit application to AAA's credit manager, R.J. Wills. Mr. Wills then reviewed Midwest Diecast's application.[1]

After checking out the listed trade references, inquiring about Midwest Diecast's credit at Dun and Bradstreet, and searching for and inquiring into prior suppliers, Mr. Wills sent a letter to Mr. Spicer in which he indicated credit could be extended to Midwest Diecast only if its president, Dr. Hicklin, and vice president, Dennis Joyner, gave their personal guaranties. Soon thereafter, Dr. Hicklin signed a personal guaranty letter dated July 16, 1988. That letter, along with a financial statement for Dr. Hicklin and his wife dated August 31, 1987, was sent to Mr. Wills at AAA.

Thereafter, on July 21, 1988, Mr. Wills approved an extension of credit to Midwest Diecast on a limited basis and two loads of aluminum were delivered to Midwest Diecast. However, Midwest Diecast did not pay for the aluminum when payment was due. In addition, Dr. Hicklin refused to pay pursuant to his personal guaranty. As a result, a judgment was obtained against Dr. Hicklin by AAA in Allen County, Kansas District Court in the amount of $74,611.00 plus interest.

Dr. Hicklin's financial statement dated August 21, 1987, listed a net worth of $1,017,972.00. The financial statement consisted of six pages: the first listed assets, liabilities and net worth; the next three were notes to the first page; and the last two contained representations concerning the financial statement. Some of the relevant representations include the following:

3. The following have been properly recorded or disclosed in the financial statements.

   a. Related party transactions and related amounts receivable or payable, including sales, purchases, loans, transfers, leasing arrangements, and *guarantees*.

   . . . .

5. There are no material transactions or balances that have not been properly recorded or disclosed in the financial statements.

   . . . .

9. No events have occurred subsequent to the date of the statement of financial condition that would requrie [sic] adjustment to, or disclosure in, the financial statements.

(Pltf.'s Ex. 4 (emphasis added).) Dr. Hicklin admits he understood that his personal guaranty and his personal financial statement had been provided to AAA in an effort to encourage them to extend credit to Midwest Diecast. (Tr., Dkt. No. 24 at p. 14.) He also understood that AAA would be relying upon his personal guaranty and personal financial statement in making a credit decision. (*Id.*) Furthermore, Dr. Hicklin does not challenge the bankruptcy court's finding that the financial statement was materially false.[2]

In regard to the reasonableness of AAA's reliance on the financial statement,

---

1. Mr. Wills' official title is Vice President and Controller of Arkansas Aluminum. He is responsible for all of the financial and credit affairs of AAA. In addition, since he had worked in the banking industry for some 35 years, he had extensive experience with credit applications.

2. In fact, there were many large personal guaranties given by Dr. Hicklin to his creditors that were left out of the financial statement. Some of the guaranties were entered into before the August 1, 1987 preparation date of the financial statement and some were entered into between the August 1, 1987 preparation date and the date such financial statement was submitted to AAA (July, 1988). None of the nonlisted guaranties were disclosed to AAA when it made the decision to extend credit.

the bankruptcy court in relevant part specifically found as follows:

The financial statement, Exhibit 4, is very professional, it is complete, it's detailed, it's annotated, and although it's typed out, presumably on some sort of computer, the fact that it's not on the standard bank form does not render it inaccurate or—excuse me, inadequate. Rather it suggests a greater level of financial sophistication than the rather simple two-page financial statements most institutions require. There is no suggestion that there are blanks or omissions which would cause some one to want to check further. Indeed, the financial statement on its four corners, seems to be remarkably complete....

(Tr., Dkt. No. 15 at p. 12.)

The bankruptcy court went on to hold that:

[V]erification is necessary only when some financial red flag is raised such as the information is clearly inadequate or inaccurate based on existing information in the file. That simply does not exist in this case.

The Court is also concerned, as it has stated several times, that verification would be impossible in the situation like this.

(*Id.*, p. 13.)

### Conclusions of Law

To prove that a debt is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(B), it must be established that the debtor obtained "money, property, services or an extension, renewal or refinancing of credit" by:

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive;

...

11 U.S.C. § 523(a)(2)(B). The party requesting the court to find a debt nondischargeable pursuant to such section has the burden of proving all elements thereof by clear and convincing evidence. *In re Black*, 787 F.2d 503, 505–506 (10th Cir. 1986).

Dr. Hicklin only challenges the bankruptcy court's finding that AAA reasonably relied on the financial statement he submitted. Thus, all other elements of nondischargeability pursuant to § 523(a)(2)(B) will be deemed established for purposes of this appeal and will not be addressed.

The Tenth Circuit, in *In re Mullet*, 817 F.2d 677, 679 (10th Cir.1987), directed that the reasonableness of a creditor's reliance is to be "evaluated according to the particular facts and circumstances present in a given case." That court also instructed that the reasonableness of a creditor's reliance is not to be weighed against the degree of dishonesty of the debtor—the element of reasonable reliance must be independently established. *Id.* at 680. In addition, the court is to focus on whether reliance on the financial statement by the creditor was reasonable—not whether the loan, in hindsight, was reasonable. *Id.* at 681.

The basic facts in *Mullet* were that a bank had obtained a credit report on the debtor. Several loans in that credit report were not on the financial statement which the debtor provided to the bank. *Mullet*, 817 F.2d at 680. Based on these facts, the Tenth Circuit concluded that it could not find that the bankruptcy court's finding—that the bank did not reasonably rely on the financial statement submitted by the debtor—was clearly erroneous. *Id.* at 681.

The Tenth Circuit also distinguished some other cases which had held that "reliance upon representation of the debtor is not unreasonable simply because the creditor failed to take steps to verify the information" because those cases, unlike the case in *Mullet*, involved: (1) an ongoing relationship between the debtor and creditor; (2) the statements in question contained no information which indicated that further investigation was required; (3)

there was no indication that further investigation would have uncovered the falsity of the representations; or (4) the asserted failure to verify occurred after the loan had been made. *Id.* at 681. In other words, *Mullet* implicitly recognizes that in these four factual situations verification of the information in the financial statement is not necessary.

As the court has previously indicated, the bankruptcy court specifically found that the financial statement submitted by Dr. Hicklin appears on its face to be very professional and complete, and does not suggest one should look further. The bankruptcy court also found that "verification would be impossible" in this case. Such findings fall squarely within the second and third factual situations (where verification would not be necessary) recognized in *Mullet.*

In an attempt to avoid such a finding, Dr. Hicklin seems to argue that a different rule of law applies to this case. At pages 6–8 of his brief, Dr. Hicklin argues that if the creditor and debtor do not have an ongoing business relationship, then there is some duty imposed on the creditor to verify the information in the financial statement. Such is not the applicable rule. The Tenth Circuit in *Mullet* recognized an "ongoing business relation" as merely one of four factual situations where a duty to verify would not be imposed. Thus, Dr. Hicklin's argument for a different rule is without merit.[3]

Dr. Hicklin also argues that AAA did not reasonably rely on the financial statement (should have a duty to verify its information) because certain facts should have alerted AAA that everything in the financial statement might not be completely accurate and up-to-date. Those certain facts include: the financial statement was "stale" since it was 11 months old; the financial statement was jointly made with Dr. Hicklin's wife, who was not guaranteeing the debt; and a comparison of the value of Midwest Diecast's stock as listed in Dr. Hicklin's financial statement with a statement of Midwest Diecast's current financial condition indicates that Midwest Diecast had decreased in value, making the August 31, 1987 financial statement inaccurate.

Such an argument by Dr. Hicklin is not persuasive for two reasons. First, paragraph 9 of the financial statement specifically states:

No events have occurred subsequent to the date of the statement of financial condition that would requrie [sic] adjustment to, or disclosure in, the financial statements.

In spite of the clear language of such provision, Dr. Hicklin contends that since this financial statement was prepared in August, 1987, it does not make any representation as to its accuracy after that date. Such a position is without merit. Dr. Hicklin admits he knew the statement was being sent to AAA in July, 1988, and that it would rely on the statement. A reasonable person reading the statement would conclude that it imposed a duty on Dr. Hicklin to inform persons receiving the statement after it was prepared of changes in his financial condition which made the statement inaccurate.

The second reason Dr. Hicklin's argument is not persuasive is that it does not show clear error in the bankruptcy court's findings of fact. Thus, this court must affirm the bankruptcy court's findings. *In re Branding Iron Motel, Inc.,* 798 F.2d 396, 399 (10th Cir.1986). *See also Matter*

---

**3.** Dr. Hicklin's reliance on *Matter of Bogstad,* 779 F.2d 370 (7th Cir.1985), for such a rule is also without merit. That court merely noted by dicta in a footnote that it may be unreasonable for a bank to rely on the accuracy of a statement where land valuation is a central issue to its accuracy—a bank should be skeptical about a landowner's belief as to the value of his land. *Id.* at 372–73 n. 4. Furthermore, even if that case did set forth a controlling rule, such case is distinguishable because AAA is not attacking the financial statement's accuracy on the basis of an understated valuation estimate. AAA's primary complaint with the financial statement is its failure to include several large personal guaranties. In addition, this court believes another important distinguishing feature is that this case does not involve the extension of credit by a creditor whose primary business is the extension of credit (e.g., a bank).

*of Bonnett,* 895 F.2d 1155, 1158 (7th Cir. 1989):

> We believe that even if the Banks' comparison of the financial statements should have raised "red flags," the bankruptcy court did not commit clear error in determining the Banks proved, by clear and convincing evidence, they reasonably relied on that comparison. This conclusion is bolstered by the fact that the Banks toured the facility and had numerous meetings with Bonnett. We do not believe that the current state of the law requires the Banks to seek a more detailed investigation under the circumstances, and the bankruptcy court did not misapply the law to the facts.

Furthermore, given the applicable law and the facts before the bankruptcy court, its findings were the same as this court's findings would have been in the first instance.

IT IS THEREFORE ORDERED this 4 day of October, 1990, that the bankruptcy court's order pursuant to 11 U.S.C. § 523(a)(2)(B) denying the appellant's discharge of a debt owed to the appellee is affirmed.