E. GRADY JOLLY, Circuit Judge:
 

 Robert P. and Wesley Ann Jordan appeal from a district court order affirming a bankruptcy court’s determination that their debt to the Southeast National Bank is nondischargeable' under 11 U.S.C. § 523(a)(2)(B). In concluding that the Jor-dans’ debt to Southeast is nondischargeable, the bankruptcy court found that the Jordans had intentionally submitted materially false financial statements to Southeast, and that these statements had induced Southeast to lend the Jordans $212,-000. The district court accepted these factual findings; the Jordans, however, argue that they are clearly erroneous. The Jordans further contend that the bankruptcy court, as well as the district court, erred by liberally construing the evidence in Southeast’s favor, by granting Southeast attorney’s fees, and by excepting from discharge sums in excess of the principal owed to Southeast. We affirm.
 

 I
 

 On February 25, 1985, the Jordans and one O’Neil Deceteau, Jr. met with Robert Terry Blackwell, Executive Vice President of Southeast, at the Southeast bank in Hammond, Louisiana. The Jordans sought a short-term loan from Southeast in order to purchase 108 acres of real estate from Deceteau, a well-known Southeast customer who had held sub
 
 *223
 
 stantial deposits with the bank ever since it had opened its doors only six months earlier. At this February meeting, the Jordans submitted two balance sheets to Blackwell, one listing their assets and liabilities as individuals, the other detailing the assets and liabilities of Bob Jordan Realty Company, Inc., their wholly-owned corporation. Blackwell reviewed these balance sheets and discussed with the Jordans the assets listed therein. He also asked the Jordans to provide him with additional financial information, particularly data concerning their income and the income of their corporation. The meeting then adjourned.
 

 Almost one month later, the Jordans sent Blackwell two supplementary financial statements prepared by the Jordans’ accountant of twenty years, Alvin Kimble. As requested, these statements included earnings information for the Jordans and their realty company, respectively. The statements, like the balance sheets, were dated as of January 15, 1985. Southeast did not order a credit report on the Jordans or their enterprise, but its president did phone the president of Clinton Bank (a Baton Rouge bank and one of the Jordans’ largest creditors) to inquire into the Jor-dans’ character and financial stability. According to Blackwell, the Clinton Bank’s positive recommendation, coupled with the balance sheets and the supplementary statements, led him to approve the Jordans’ application. Consequently, the loan was closed on March 28, 1985, at which time the Jordans executed a $212,000 promissory note secured by a collateral mortgage on the property the Jordans subsequently bought from Deceteau. A balloon repayment of the 13.75% A.P.R. loan was set for September 26, 1985.
 

 The Jordans defaulted shortly thereafter, whereupon Southeast obtained a writ of seizure and sale on the mortgaged property from an appropriate Louisiana court. Subsequently, the sheriff of Livingston Parish, Louisiana executed the writ by selling the land to Southeast for $72,659.40 at a public auction. Southeast continued to pursue the balance due on the promissory note, eventually reducing its claim against the Jordans to judgment on May 27, 1987.
 

 Only two days later, the Jordans filed a voluntary joint petition with the United States Bankruptcy Court for the Southern District of Mississippi, seeking protection under Chapter 7 of the Bankruptcy Code. Southeast reacted to the Jordans’ filing by bringing an adversary proceeding, wherein it asked the Bankruptcy Court to determine whether the outstanding portion of the Jor-dans’ debt was nondischargeable under Code § 523(a)(2)(B).
 
 [1]
 
 Southeast contended that it was; it argued that both balance sheets and both supplementary statements contained materially false financial data, that the Jordans knew these data to be materially false, and that it relied on these data when deciding to approve the Jordans’ application.
 

 The bankruptcy court ruled for Southeast in an August 31, 1988 opinion and order. In doing so, it added interest and attorney’s fees to the balance due on the Jordans’ debt and made the entire $267,653 sum nondischargeable. The Jordans then appealed to the district court, which on July 13, 1990, affirmed the bankruptcy court’s order with a one paragraph order of its own. This appeal followed.
 

 II
 

 The Jordans raise five challenges to the district court’s order; we address these in turn. At the outset, however, we note that the bankruptcy court’s findings of fact are not to be set aside unless clearly erro
 
 *224
 
 neous. Bankruptcy Rule 8013;
 
 Richmond Leasing Co. v. Capital Bank N.A.,
 
 762 F.2d 1303 (5th Cir.1985);
 
 Matter of Boonett,
 
 895 F.2d 1155 (7th Cir.1989). Any conclusion of law, of course, is subject to
 
 de novó
 
 review. Bankruptcy Rule 8013;
 
 Matter of Bufkin Bros., Inc.,
 
 757 F.2d 1573 (5th Cir.1985).
 

 A
 

 The Jordans begin by denying that they provided Southeast with data that were materially false. They admit that their balance sheets and supplementary statements omitted several of their own and their corporation’s liabilities, but assert that certain assets used to secure these" liabilities were also excluded from these documents. As they see it, the unmentioned assets were approximately equivalent in value to the unmentioned liabilities. Thus, they conclude, the omissions did not render their data materially untrue, " because the data gave an essentially accurate portrayal' of their aggregate net worth.
 

 We begin our analysis of this argument by observing that the bankruptcy court’s finding regarding the Jordans’ omissions and falsehoods is — in this context — subject to clearly erroneous review.
 
 See, e.g., In re Kimzey,
 
 761 F.2d 421, 423-24 (7th Cir.1985). A materially false statement is one that “paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit.”
 
 In re Nance,
 
 70 B.R. 318, 321 (Bankr.N.D.Tex.1987), citing
 
 In re Denenberg,
 
 37 B.R. 267 (Bankr.D.Mass.1983). Further, in determining whether a false statement is material, a relevant although not dispositive inquiry is “whether the lender would have made the loan had he known the debtor’s true situation.”
 
 In re Bogstad,
 
 779 F.2d 370, 375 (7th Cir.1985). Finally, it is well-established that writings with pertinent omissions may qualify as “materially false” for purposes of § 523(a)(2)(B).
 
 In re Biedenham,
 
 30 B.R. 342 (Bankr.W.D.La.1983).
 

 With these principles as a backdrop, we reject the Jordans’ argument for two independent reasons. First, the couple has failed to substantiate their assertion that the omitted liabilities were accompanied by omitted assets. Their appellate .brief refers only to an answer given by Kimble during his deposition. In this cited answer, however, Kimble does nothing to suggest that the Jordans indeed withheld both asset and liability information. Second, even if the Jordans’ assertion were borne out by the record, the data they submitted to Southeast were materially false for reasons wholly apart, from omitted liabilities. Stated another way, the missing liabilities on the Jordans’ balance sheets and supplementary statements were but the tip of the proverbial iceberg. For instance, their data failed to disclose the fact that almost $400,000 of théir liquid assets (including all of their cash) had been pledged to creditors; the couple also neglected to mention that Robert Jordan had executed two guarantees, one of which was for $66,000. Moreover, although the bankruptcy court made no factual finding as to whether the bank — then only six months old — would have issued the loan had the Jordans provided it with additional information, Blackwell testified that the loan would never have been approved if the Jordans’ financial statements had revealed the encumbrances on their liquid assets.
 
 See In re: Bogstad,
 
 779 F.2d at 375. We thus agree with the bankruptcy court that the Jordans provided Southeast with written financial documents that were “materially false.”
 

 B
 

 The Jordans’ second argument is akin to their first. The couple contends that the bankruptcy court committed reversible error by failing to construe liberally the evidence in their favor. This argument is meritless. First, we should note that the Jordans have not demonstrated that the bankruptcy court interpreted the evidence to the advantage of either party. Second, in asserting this argument, the couple misstates the message of the cited cases. The opinions on which they rely support the almost axiomatic proposition that “[a] guiding principle in analyzing
 
 *225
 
 [§ 523’s] exceptions [to discharge] is that they be narrowly and strictly con-strued_”
 
 In re Levitan,
 
 46 B.R. 380 (Bankr.E.D.N.Y.1985). The rationale of reading the nondischargeability provisions narrowly, of course, is to help preserve “the Code’s basic policy of giving an honest debtor a ‘fresh start.’ ”
 
 In re Medlin,
 
 74 B.R. 726, 729 (Bankr.N.D.N.Y.1986). Contrary to the Jordans’ argument, however, neither the cases nor the code stand for a rule that bankruptcy judges, when reviewing a creditor’s contention under § 523, are obliged to view evidence in a manner slanted in the debtor’s favor. Accordingly, if the bankruptcy court indeed decided to view the evidence without skewed lenses, its decision was perfectly proper.
 

 C
 

 Next, the Jordans assign as error the conclusion that Southeast “reasonably” relied on the balance sheets and supplementary statements. They have no quarrel with the bankruptcy court’s finding that Southeast in fact relied on their financial data. Rather, their argument is that Southeast’s reliance assumed too much; the bank, they contend, should have investigated their background more fully. The reasonableness of reliance is a conclusion of law, which we review accordingly.
 
 In re Bonnett,
 
 73 B.R. 715, 721 (C.D.Ill.1987);
 
 In re Martz,
 
 88 B.R. 663 (Bankr.E.D.Pa.1988).
 

 In support of their argument, the Jordans highlight three facts. First, they were first-time customers of Southeast, about whom the bank knew little. Second, in spite of their unfamiliarity, Southeast never requested a credit report on them as individuals. And third, in his cover letter for the balance sheet that listed the Jordans’ individual assets and liabilities, Kimble made the following caveat:
 

 Bob and Wesley Jordan have elected to omit substantially all of the disclosures required by generally accepted accounting principles. If the omitted disclosures were included in the financial statement, they might influence the user’s conclusions about the financial condition of Bob and Wesley Jordan. Accordingly, this financial statement is not designed for those who are not informed about such matters.
 

 The Jordans’ point is well-taken, but we are nevertheless convinced that Southeast’s reliance on the Jordans’ data, although perhaps not the most prudent of banking practices, was not unreasonable. Incontestably, in early 1985 the Jordans’ faces were. new and unfamiliar to Southeast executives. The couple was, however, accompanied by and seeking to purchase land from Deceteau, a regular and well known customer with substantial Southeast deposits. The failure to obtain a credit report on the Jordans is explainable: In Louisiana, these reports reflect only consumer debt, not commercial transactions such as mortgages, and as such can mislead a lender.
 
 See generally In re Mutschler,
 
 45 B.R. 482, 493 (Bankr.D.N.D.1984) ( ... in the present instance, a credit check would have served no purpose because it would not have revealed inaccuracies or omissions and probably would have left a creditor with a false impression of honesty on the part of the debtor”). Southeast’s president, on the other hand, took the trouble to contact personally the chief executive of the Bank of Clinton in an effort to assay the Jordans’ credit history as well as the accuracy of their financial statements. Moreover, Blackwell had detailed conversations with the debtors concerning their submitted data and obtained from them explicit representations as to their assets and net worth. Kimble’s disclaimer is mitigated by the fact that, since the Jordans had employed the same accountant for some twenty years, Blackwell was within his rights to place additional credence in Kimble's professional representations, the disclaimer notwithstanding. Furthermore, Bob Jordan Realty, Inc. accounts for $767,325 of the $942,992 net worth listed on the Jordans’ individual balance sheet — and the reservation Kimble expressed with regard to the Jordans’ individual balance sheet is conspicuously absent from the balance sheet Kim-ble prepared for Bob Jordan Realty, Inc.
 

 In re Mullet,
 
 817 F.2d 677 (10th Cir.1987), on which the Jordans rely, does not
 
 *226
 
 support a different conclusion. We find that case distinguishable: Unlike the present cause,
 
 Mullet
 
 involved a
 
 young
 
 (23 years old) unproven bank customer, “there were inconsistencies in his representations, [and] minimal investigation and verification almost certainly would have uncovered the falsity of the representations_”
 
 Mullet,
 
 817 F.2d at 681. In truth, the requisite level of investigation in
 
 Mullet
 
 was so low that the responsible loan officer need only have phoned a broker in order to determine that a stock listed among Mullet's assets was not, contrary to Mullet’s claims, listed, on the New York Stock Exchange or publicly traded. Here, the debtor was introduced by an established customer of the bank, there were no inconsistencies in the data furnished, the collateral was known by the bank, and the bank checked with one of the debtors’ primary lenders.
 
 Id.
 
 In short,
 
 Mullet
 
 had considerably more red flags to alert a would-be lender. Properly viewed, the instant case is most analogous to
 
 Matter of Garmain,
 
 643 F.2d 1252 (1980),
 
 cert. den.,
 
 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981), cited by
 
 Mullet
 
 as indicative of reasonable reliance.
 

 D
 

 With their fourth argument, the Jordans seek to impeach the bankruptcy court’s factual finding that they intended to deceive Southeast with their financial statements. Essentially, they contend that the bankruptcy court’s determination was clearly erroneous and that
 
 In re Iesman,
 
 64 B.R. 58 (Bankr.N.D.Ohio 1986), cited in the court’s August 31, 1988 order, ought not apply to their case.
 

 We are unpersuaded that these arguments have merit. With respect to the Jordans’ second stance,
 
 lesman
 
 admittedly is not on all fours, factually speaking, with the case now before us. Nevertheless,
 
 les-man
 
 is not so far afield as to discredit its message: that debtors with business acumen, like the Jordans, are to be held to a higher standard.
 
 [2]
 

 See also In re Mutschler,
 
 45 B.R. 482 (Bankr.D.N.D.1984) (“Where the debtor is an individual of intelligence and experience in financial matters,. courts have been more inclined to hold them responsible for uttering a false financial statement”). As for the first argument, our review of the record convinces us that the bankruptcy judge was well within his discretion in inferring an intent to deceive from the circumstances surrounding the preparation and submission of the Jor-dans’ financial statements.
 
 In re Brown,
 
 55 B.R. 999, 1004 (Bankr.E.D.N.Y.1986). Put another way, the bankruptcy judge's decision to draw from the Jordans’ omissions and misrepresentations the inference of deceptive intent was not clearly erroneous. Accordingly, we now pass on to the Jordans’ final assignment of error.
 

 E
 

 Lastly, the Jordans argue against the bankruptcy court’s decision to award Southeast attorney’s fees and to except from discharge the fees as well as the interest on the Jordans’ original debt. The Jordans’ position, simply stated, is that no Code authority supports these actions. They shore up this argument by citing three bankruptcy opinions, each of which refused either to grant a creditor attorney’s fees or to exempt from discharge a creditor claim of fees or of interest accrued on a debt:
 
 Florida National Bank v. Gordan,
 
 91 B.R. 135, 138 (Bankr.N.D.Fla.1988);
 
 In re The Record Co.,
 
 8 B.R. 57, CCH Law Reports, ¶ 67,746 (Bankr.S.D.Ind.1980);
 
 In re Lacey,
 
 CCH Law Reports, ¶ 67,715, 1980 WL 6782 (Bankr.S.D.N.Y.1980).
 

 One strand of the Jordans’ argument deserves only marginal treatment. Technically speaking, the Jordans are correct in stating that the Bankruptcy Code does not expressly award attorney’s fees to a creditor who successfully contests the dischargeability of his claim. It is equally
 
 *227
 
 clear, however, that “creditors are entitled to recover attorney’s fees in bankruptcy claims if they have a contractual right to them valid under state law_”
 
 Security Mortgage Co. v. Powers,
 
 278 U.S. 149, 153-54, 49 S.Ct. 84, 85-6, 73 L.Ed. 236 (1928);
 
 see also In re Martin,
 
 761 F.2d 1163 (6th Cir.1985). Such is the case here: The loan agreement grants Southeast attorney’s fees in the event of the Jordans’ default, as permitted by Louisiana law.
 
 Austin v. Parker,
 
 672 F.2d 508 (5th Cir.1982);
 
 Nat Harrison Associates, Inc. v. Gulf States Utilities Co.,
 
 491 F.2d 578 (5th Cir.1974). Hence, what remains of the Jordans’ argument is their contentions that the attorney’s fees and the interest, unlike the principal, are not exempt from discharge. Neither party has pointed us to Fifth Circuit case law taking up these contentions; similarly, our research has uncovered no holdings on point. Within this circuit, it seems the Jordans have posed two questions of first impression.
 

 That is not to say, however, that other circuits have yet to address the Jordans’ remaining arguments. For present purposes,
 
 In re Martin,
 
 761 F.2d 1163 (6th Cir.1985) marks the most noteworthy treatment of the dischargeability of attorney’s fees issue. The facts in
 
 Martin
 
 are much like those in this case: A bank filed an adversary proceeding against husband and wife joint debtors in order to determine whether a loan it had previously extended to them was nondischargeable under § 523(a)(2)(B). In addition to its loan, the bank sought attorney’s fees and court costs from the debtors. The bankruptcy court ruled in the bank’s favor on the non-dischargeability of its loan; it denied, however, the bank’s request for fees and costs, notwithstanding the fact that the debtor’s note provided otherwise. The Sixth Circuit reversed insofar as the bankruptcy court’s disposition of the fees and costs request was concerned. It reasoned as follows:
 

 The Bankruptcy Act explicitly grants fees and costs to prevailing debtors:
 

 (d) If a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment against such creditor and in favor of the debtor for the costs of, and a reasonable attorney’s fee for, the proceeding to determine dis-chargeability, unless such granting of judgment would be clearly inequitable.
 

 11 U.S.C. § 523(d);
 
 see In re Carmen,
 
 723 F.2d 16 (6th Cir.1983).
 

 The congressional failure to award attorney’s fees to prevailing creditors was not accidental. Congress enacted section 523(d) out of concern that creditors were using the threat of litigation to induce consumer debtors to settle for reduced sums, even though the debtors were in many cases entitled to discharge. [...] However, creditors are entitled to recover attorney’s fees in bankruptcy claims if they have a contractual right to them under state law, which appears to be the case here....
 

 We do not think that section 523(d) prevents the award of attorney’s fees and costs to creditors so entitled as a matter of contract under state law. There is simply no hint of that intention in the text of the statute.
 
 To the contrary, 11 U.S.C. § 523(a)(2)(B) excepts from discharge the whole of any debt incurred by use of a fraudulent financial statement, and such a debt includes state-approved contractually required attorney’s fees.
 

 Contrary to the Martins’ argument, our holding does not undercut congressional intention. Section 523(d) still gives prevailing debtors in an adversary proceeding a right to attorney’s fees, where they had none before. Prevailing creditors still have no statutory rights to attorney’s fees, and if they have a contractual right, it must be assumed they gave value for that right at the time credit was advanced.
 

 Martin,
 
 761 F.2d at 1168 (emphasis added).
 

 We find the
 
 Martin
 
 approach to the attorney’s fees problem persuasive. As the Sixth Circuit panel notes, this tack neither robs § 523(d) of meaning nor cuts against the grain of its legislative history. We would add that a contrary rule sane-
 
 *228
 
 tioning the discharge of attorney’s fees on a contractual debt otherwise nondischargeable would leave dishonest debtors better off under the Code than under state law without furthering a bankruptcy policy. Accordingly, such a rule would violate the Code’s underlying principle that, unless a bankruptcy reason demands it, debtors and creditors should not be treated one way under state law and another way under federal bankruptcy law. Furthermore, it would impede the Code purpose of discharging only the honest debtor from his debts.
 
 Williams v. United States Fidelity & Guaranty Co.,
 
 236 U.S. 549, 35 S.Ct. 289, 59 L.Ed. 713 (1915);
 
 In re Garman,
 
 643 F.2d 1252, 1257 (7th Cir.1980).
 

 In adopting the
 
 Martin
 
 approach and affirming the bankruptcy court’s choice to exempt Southeast’s attorney’s fees from discharge, we join ranks with a host of other opinions that share the Sixth Circuit’s thinking.
 
 In re Ziegler,
 
 109 B.R. 172 (Bankr.W.D.N.C.1989) (“A majority of the courts deciding cases under § 523(a)(2) and (a)(4) agree with the reasoning in
 
 Martin
 
 ....”);
 
 In re Hecker, 95
 
 B.R. 1 (Bankr.D.D.C.1989);
 
 Matter of Cheatham,
 
 44 B.R. 4 (Bankr.N.D.Ala.1984);
 
 In re Foster,
 
 38 B.R. 639 (Bankr.M.D.Tenn.1984);
 
 In re Crosslin,
 
 14 B.R. 656 (Bankr.M.D.Tenn.1981).
 

 Much of the foregoing bears on our resolution of the Jordans’ objection to the non-dischargeability of interest. In fact, we need note only that additional authority supports our decision to treat as exempt from discharge the interest to which Southeast is entitled under state law.
 
 See Heck-er,
 
 95 B.R. 1 (“[ijnterest is clearly part of the debt for money obtained by the Debt- or’s false representations”);
 
 In re Romero,
 
 535 F.2d 618, 623 (10th Cir.1976);
 
 Matter of Church,
 
 69 B.R. 425, 435 (Bankr.N.D.Tex.1987).
 

 Ill
 

 As we are shown no error in the bankruptcy court’s disposition of the present cause, we AFFIRM the judgment of the district court.
 

 [1]
 

 . § 523(a)(2)(B) reads as follows:
 

 (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt
 

 (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by
 

 (B) use of a statement in writing
 

 (i) that is materially false;
 

 (ii) respecting the debtor's or an insider's financial condition;
 

 (iii) on which the creditor to whom the debt- or is liable for such money, property, services, or credit reasonably relied; and
 

 (iv) that the debtor caused to be made or ' published with intent to deceive.
 

 [2]
 

 . By their own admission, the Jordans are well-versed in the language of business. Wesley Jordan was graduated from Louisiana State University with a degree in marketing and has kept the books for their realty company. Bob Jordan has been embroiled in real estate affairs since 1960.