In re Robert Owen SLONAKER and Lynn Ellen Slonaker, Debtors.

The First National Bank of Byers, N.A.–The Cattleman's Branch, Plaintiff,

v.

Robert Owen Slonaker and Lynn Ellen Slonaker, Defendants.

Bankruptcy No. 99–70492 RCM–7. Adversary No. 99–7021.

United States Bankruptcy Court, N.D. Texas, Wichita Falls Division.

July 13, 2001.

Ronald L. Yandell, Law Offices of Ron L. Yandell, Wichita Falls, TX, for debtors/defendants.

Hank Rugeley, Davison & Rugeley, Wichita Falls, TX, for plaintiff.

Harry L. Cure, Jr., Harry L. Cure, Jr., P.C., Ft. Worth, TX, Stanley R. Watson, Quanah, TX, for trustee.

### *MEMORANDUM OPINION*

ROBERT McGUIRE, Chief Judge.

On May 16, 2001, came on to be heard this § 523(a)(2)(A), (a)(2)(B), and (a)(6) action filed by The First National Bank of Byers, N.A.-The Cattleman's Branch ("Plaintiff" or "Bank") against Robert Owen Slonaker ("ROS") and Lynn Ellen Slonaker ("LES") (collectively, "Defendants" or "Debtors"). The Court has core jurisdiction over this matter under 28 U.S.C. § 1334 and 157(b)(2)(I). Following are the Court's findings of fact and conclusions of law under Bankruptcy Rule 7052.

### *Background*

Debtors filed a voluntary petition for bankruptcy, pursuant to Chapter 7, on February 24, 1998.

At all times relevant to this proceeding, Defendants were married. LES has an associate degree in business and a degree in human resources. ROS has a MBA degree.

On or about February—March 1995, ROS formed a Texas corporation which was named Craigmont Industries, Inc. ("Craigmont"). Craigmont also filed Chapter 7 bankruptcy on February 24, 1998. It failed as a result of business conditions.

ROS was the controlling shareholder and president of Craigmont at all relevant times. LES was the secretary/treasurer of Craigmont at all relevant times.

On or about March 20, 1995, ROS, on behalf of Craigmont, executed a promissory note to Plaintiff in the original principal amount of $100,000 for a loan to Craigmont from Plaintiff. (Plaintiff's Exhibit ("Ex.") ("PX") 10.)

To obtain the $100,000 loan on March 20, 1995, ROS made representations to the Plaintiff, including representations as to the amount of his and his father's capital investment into Craigmont. Cash in the amount of $80,000, plus $10,000 in equipment, was to be invested by ROS and $85,000 cash was to be invested by his father Francis B. Slonaker ("FBS"). (PXs 4–7.)

The Plaintiff's loan approval form dated March 1, 1995, and signed by Ms. Bowersock of the Bank (PX 9) states in part that: "Mr. Slonaker is putting in $185,000 of his own personal money to purchase this business." Ms. Bowersock testified that she knew this meant that ROS and FBS, in combination, were putting up the $185,000. Craigmont's minutes, dated March 10, 1995, show ROS purportedly invested $77,000 in cash and a 1993 Ford truck valued at $10,000, and that FBS invested $85,000. (PX 28, Craigmont Minutes of March 10, 1995.) The purchase and sales agreement to buy the business, dated February 28, 1995, shows ROS agreed to a

down payment of $190,000 (PX 38) for purchase of the business.

Prior to March 20, 1995, ROS did not say he or FBS was loaning money to Craigmont, as opposed to investing in Craigmont. Ms. Bowersock, of Plaintiff, testified that it was important for Plaintiff to know that the monies from ROS and FBS were investments, as opposed to loans to Craigmont, because the Bank would usually require an investment of at least 20% in a business before a loan would be approved. Ms. Bowersock was the loan officer of Plaintiff who was dealing with ROS on the loans in question.

ROS issued written financial statements to Plaintiff (PXs 2 and 3) to obtain the March 20, 1995 loan of $100,000, which included a representation that he owned a 30% interest in an Ohio family farm worth $75,000, free and clear of any liens. (PXs 2,[1] and 3, respectively dated February 6, 1995, and February 6, 1995.) ROS also submitted his February 21, 1996 financial statement to the Bank (PX 16), showing Debtor's 40% unencumbered interest in the Ohio farm to be worth $103,840. ROS's last financial statement submitted was dated January 27, 1997. (PX 29.) It showed the unencumbered Ohio farm interest to be worth $175,000. PX 29 did not specifically list any indebtedness owed to Plaintiff. (PX 29 at 4.)

Ms. Bowersock testified that ROS told her that by 1997, he and his brother would own the Ohio farm 50% each because of annual gifts from his parents. In response to a preceding question, the PX 2 financial statement states on the last page:

ADDITIONAL REMARKS

#1 My father is gifting the family farm to my brother & me. The gifting will be done at the end of 1997 at which time we will hold complete ownership of the farm. The approximate value of the farm is $295,000 on the open market.

[Signed Robert O. Slonaker]

Ms. Bowersock apparently never asked ROS about the details of this gifting process or how it specifically worked.

Plaintiff never asked for a lien on the farm, or for ROS not to put a lien on his interest in the farm.

PX 49 is an April 23, 1993 quitclaim deed on the Ohio farm to ROS and his brother Howard by their parents, Francis and Olivia Slonaker. The quitclaim was specifically subject to a life estate interest of his parents. (PX 49.)

At such date, his father was approximately eighty-two years of age and his mother was approximately eighty years of age. (PX 64 at 98.) This is the Ohio farm referred to in the financial statements given by ROS to Plaintiff. This quitclaim deed was recorded May 6, 1993. (PX 49 at 2.) This was the Ohio farm.

PX 50 is an April 1993 mortgage from ROS, LES, and Howard Slonaker and his wife to Francis and Olivia Slonaker to secure a $300,000 obligation against the same Ohio property. Apparently, through the annual gift tax exclusion, approximately $80,000 of such $300,000 obligation was to be gifted or forgiven each year, i.e., Francis' gifts for $10,000 each to ROS and Howard Slonaker, and their wives ($40,-

---

1. PX 2 appears to be dated July 6, 1995, rather than February 6, 1995. However, in her testimony, Ms. Bowersock referred to same as being dated February 6, 1995. She also testified that PX 2 was not completely filled out, and therefore, ROS furnished PX 3, his financial statement dated February 6, 1995, to the Bank, attached as part of PX 2. Both PXs 2 and 3 show the unencumbered Ohio farm interest to be worth $75,000.

·000), and Olivia's like $40,000 gifts each year.

While there were no written records offered into evidence conferring such approximate $80,000 per year forgiveness of debt (and ROS was not aware of any such documents (PX 64 at 85)), page 2 of PX 50 shows that Francis and Olivia signed and filed a document in the mortgage records stating:

> The conditions of this mortgage have been met and the Recorder is hereby authorized to cancel and release this mortgage this 24th day of *February, 1997.*
>
> > Francis B. Slonaker
> >
> > Olivia O. Slonaker
>
> Copied from the original mortgage this 24th day of February, 1997.
>
> ATTEST: Gene Wood, RFC     BY: *[Marcia George],* Deputy

(Emphasis supplied.)

The last financial statement submitted by ROS to Plaintiff was PX 29, dated January 29, 1997, showing the Ohio farm with no liability against it and with a value of $175,000. This was incorrect because the $300,000 mortgage (PX 50) was not released until February 24, 1997, *i.e.,* approximately three weeks later.

Ms. Bowersock testified that she did not run off (*i.e.,* apparently for ROS's signature) the December 26, 1996 renewal note of $140,593 (PX 22) until she received the financial statement of January 29, 1997. (PX 29.) Craigmont was furnishing financial statements to Plaintiff during the course of the loan: Craigmont's December 31, 1995 financial statement shows notes payable to shareholders of $189,000 (Defendant's Exhibit ("DX") 3); Craigmont's February 26, 1996 financial statement shows shareholder notes of $199,500 (DX 4); Craigmont's June 30, 1996 financial statement (DX 6) shows the same share-

holder notes as do the August 31, 1996 (DX 8), September 30, 1996 (DX 7), and the June 1997 (DX 9) financial statements. Ms. Bowersock had these reports at or about the dates thereof.

The prior financial statements given to the Plaintiff, February 6, 1995 (PX 2), February 6, 1995 (PX 3), and February 21, 1996 (PX 16), were inaccurate because they did not show any of the remaining liability of the Slonakers on the $300,000 mortgage. (PX 50.) The loans from ROS's parents to him, described below, were not reflected on any financial statement given to the Bank. Assuming the $80,000 per year gifts in 1993, 1994, and 1995, *i.e.,* $240,000 total, there would still have been a remaining mortgage on the Ohio farm of at last $60,000 in 1995. However, as indicated above, Ms. Bowersock had been told by ROS that he and his brother would not own the Ohio farm until 1997. *(See also* PX 2, financial statement from ROS quoted above, reflecting that the gifting of the Ohio farm was not to be completed until the end of 1997.)

As of February 24, 1997, there were apparently no liens affixed against the Ohio farm. (PX 50.)

In 1997 and 1998, as described below, and after execution or renewal of all the notes to Plaintiff, the Defendants' gave $165,000 in liens on the Ohio farm to ROS's parents. ROS had received the following personal loans from his parents in connection with purchasing the business in question: (PX 64 at 105 and 52.)

| Amount | Date |
|---|---|
| $ 70,000 | February 8, 1995 |
| 15,000 | March 9, 1995 |
| 30,000 | September 30, 1996 |
| 20,000 | October 14, 1997 |
| 30,000 | November 28, 1997 |
| $165,000 | |

The Craigmont March 10, 1995 corporate minutes (PX 28) show $77,000, plus

the 1993 Ford truck, invested by ROS, and $85,000 invested by his parents, for which they all received stock. At such time, ROS had received such $85,000 in loans from his parents for a substantial part of his investment in Craigmont. ROS's parents additionally made the following loans to Craigmont direct:

| Amount | Date |
| --- | --- |
| $ 25,000 | September 20, 1995 |
| $ 20,000 | October 20, 1996 |
| $ 15,000 | November 14, 1996 |
| $ 10,000 | April 23, 1997 |
| $ 70,000 | |

(PX 64 at 18–20.)

ROS's financial statements referenced above did not reflect the loans to him from his parents that were then outstanding on the date of the various financial statements. (PX 64 at 46–51, 61 and 64.)

In his deposition, ROS testified that, at the time he and his parents closed the transaction, they changed the transaction from a stock purchase to a loan. (PX 64 at 63.) At trial, ROS testified that the investments were changed from an investment to a loan after the closing, and that this was on the advice of the company attorney. The financial statements of Craigmont lend some credence to this testimony. PX 14, Craigmont's April 30, 1995 financial statement shows capital stock of $165,000, as does PX 13, page 4, Craigmont's November 30, 1995 financial statement, prior to the December 1995 $50,000 initial loan. However, Craigmont's December 1995, and subsequent financial statements show the investment as shareholder loans. (*See* Dxs 3–4 and 6–9.)

Aside from the initial mortgage on the Ohio farm securing the $300,000 (PX 50) previously discussed, and which was released February 24, 1997 (PX 50), there was no mortgage on the Ohio farm initially securing the $165,000 in loans from ROS's parents (PX 64 at 87–89). Such loans were later collateralized by a $115,000 mortgage of January 28, 1998 (PX 51), and a $50,000 mortgage of November 19, 1997.

The foregoing amounts were memorialized by cognovit notes dated January 28, 1998, in the amount of $115,000 and another cognovit note dated February 3, 1998, in the amount of $50,000. (PX 51.)

As indicated, the above liens on the Ohio farm were granted with respect to each cognovit note. (PX 51.)

A complaint in foreclosure was filed by Francis and Olivia Slonaker against ROS on March 5, 1999, seeking foreclosure of the foregoing mortgages. (PX 51.)

An order of foreclosure was entered in Cause No. 99CV116 in the Court of Common Pleas, Fairfield County, Lancaster, Ohio, which resulted in the real estate being sold in approximately June 1999, to Francis and Olivia Slonaker by the sheriff of said county for the highest and best bid of $140,000. (PX 56.)

A deficiency judgment in the amount of $45,912.65, representing the unpaid balance of the debt owed by ROS to Francis Slonaker was entered on June 10, 1999. (PXs 53–56.)

ROS's understanding was that his parents' individual loans to him were at some time going to be collateralized by liens on the Ohio farm, even though he did not verbalize it with them at the time such loans were made. (PX 64 at 105–09.) Such understanding was never referenced on any of his financial statements to the Bank.

On or about December 19, 1995, ROS executed a promissory note to Plaintiff in the original principal amount of $50,000 for a loan to Craigmont from the Plaintiff. (PX 15.) There were later renewals of these loans to Plaintiff, but no new money

was advanced by Plaintiff on these loans after December 1995.

On March 20, 1996, the March 20, 1995 loan was renewed by Craigmont. The outstanding principal on March 20, 1996, was $99,852.74. (PX 18.)

On September 16, 1996, the March 20, 1996 loan was renewed by Craigmont. The outstanding principal on September 16, 1996 was $99,665.74. (PX 20.)

ROS executed a written guaranty on September 16, 1996, by which he personally guaranteed to pay the loans of Craigmont. (PX 21.)

On December 26, 1996, the loan of December 15, 1995, for $50,000 and the loan of September 16, 1996, for $100,000 were renewed into a note for $140,593.14. (PX 22.) See the above discussion of the January 29, 1997 financial statement (PX 29), and this renewal note of December 26, 1996 (PX 22). The balance owed on the December 15, 1995 note was $42,078.04. The balance owed on the September 16, 1996 note was $98,515.00.

ROS executed a written guaranty on December 26, 1996, by which he personally guaranteed and promised to pay the loans of Craigmont. (PX 23.)

### LES

LES executed guaranties of March 20, 1995 (PX 58), and March 20, 1996 (PX 59). Such guaranties were ambiguous, because the appropriate box was not checked showing whether such guaranties were limited to specific debts or unlimited. This was typical of some of the paperwork of Plaintiff. (*See* PXs 11 and 19.) The credible evidence did not prove that LES had fraudulent intent with respect to PXs 58 and 59.

At the close of the evidence, the Court took Plaintiff's case against ROS under advisement, but ruled that there was insuf-

ficient credible evidence of any § 523(a)(2)(A), (a)(2)(B), or (a)(6) offense by LES; therefore, such claims of Plaintiff were denied. Such rulings are further memorialized by this opinion and the accompanying judgment.

LES had minimal dealings with the day-to-day business of Craigmont. (PX 65 at 26.) There was no showing that she was aware of the contents of any financial statements submitted to Plaintiff by ROS. There was insufficient proof of any fraud, false pretenses, or misrepresentations by LES to Plaintiff in connection with the loans.

### The 1993 Pickup

LES played no part in the negotiations with Plaintiff over the 1993 pickup. When the pickup truck was sold, she was not aware that the Plaintiff was still claiming a lien on it.

An issue exists as to whether Plaintiff voluntarily released its lien upon the title to the 1993 Ford pickup, Vehicle X1FTCR14U1PPA99998 (the "1993 Ford Pickup"). The parties stipulated that the value of the 1993 Ford Pickup was $6,500 at the time of the alleged conversion by Defendants.

On or about December 19, 1995, Craigmont granted Plaintiff a security interest in the 1993 Ford Pickup to secure the repayment of the loans of Craigmont to the Plaintiff. (PX 15; *see also* PX 39.)

On or about December 26, 1996, the Plaintiff's security interest in the 1993 Ford Pickup was renewed as part of the $140,593 loan renewed on or about December 26, 1996. (PX 22.)

On or about February 12, 1997, ROS requested that the ownership of the 1993 Ford Pickup be transferred from Craigmont to ROS. Ms. Bowersock testified that she had no objection to this so long as

Plaintiff would remain as lienholder, and she testified that it was under these conditions she released the title to ROS.

On February 11, 1997, Colleen Wilhelm, for Plaintiff, executed a release of lien on the 1993 Ford Pickup. (PX at 6.)

On or about September 30, 1997, ROS arranged for LES to have the title to the 1993 Ford Pickup changed to her name, and did not place the lien notation of the Plaintiff on the title. (PX 65 at 27.)

On or about March 5, 1998, the Defendants sold the 1993 Ford Pickup for the amount of $6,500, without the permission of the Plaintiff and without remitting any of the sale proceeds to the Plaintiff.

The fair market value of Plaintiff's collateral at the time of the sale was $6,500. Part of the sale proceeds were used to pay the Slonaker's property taxes and part was used for Craigmont's payroll. (PX 65 at 27–28.)

ROS purportedly issued a check to Craigmont for $4,200 for the 1993 Ford Pickup. (PX 42.)

By October 31, 1997, LES and the Slonaker family moved to Tennessee to be with ROS, who had previously moved to Tennessee to take a job. (PX 65 at 27.) Craigmont was in poor financial condition in November 1997, and ROS's parents were loaning him money to try to keep the business afloat. (See above.)

The bank foreclosed its liens on Craigmont in December 1997. (PX 64 at 89.)

At trial, the parties stipulated that the payoff on the $150,000 in notes was $155,000, allocated 70% to the $100,000 note, and 30% to the $50,000 note.

### Analysis

#### § 523(a)(2)(B)

11 U.S.C. § 523(a)(2)(B) reads as follows:

### § 523. Exceptions to discharge

(a) A discharge under section 727, 1141,, [sic] 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

\* \* \*

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

\* \* \*

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive.

The burden of proof under § 523(a) is by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 287–88, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Pursuant to 11 U.S.C. § 523(a)(2)(B), Plaintiff must prove the debtor ROS used a statement in writing (this was undisputed): (1) that is materially false; (2) respecting his financial condition (this element was also undisputed); (3) upon which FSB reasonably relied; and (4) the financial statement was given with an intent to deceive. *See Ins. Co. of N. Am. v. Cohn (In re Cohn)*, 54 F.3d 1108, 1114 (3d Cir.1995).

### Materially False

To be shown as "materially false," the document must not only be erroneous, but also contain information

causing the document to be substantially inaccurate. *Miller v. Boles (In re Boles)*, 150 B.R. 733, 740 (Bankr.W.D.Mo.1993). Actual subjective reliance is not, by itself, dispositive of materiality, because a financial statement may be material even if a creditor did not rely on it. *In re Cohn*, 54 F.3d at 1114; *Jordan v. Southeast Nat'l Bank (In re Jordan)*, 927 F.2d 221, 224 (5th Cir.1991).[2]

■ A finding of materiality can be supported by multiple misrepresentations contained in a financial statement as to assets and/or their value—that is, significant misrepresentations of financial condition. *Candland v. Ins. Co. of N. Am. (In re Candland)*, 90 F.3d 1466, 1470 (9th Cir. 1996); *La Trattoria, Inc. v. Lansford (In re Lansford)*, 822 F.2d 902, 904 (9th Cir. 1987).

■ A financial statement is materially false if it "paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit.... [W]ritings with pertinent omissions may qualify as 'materially false' for purposes of § 523(a)(2)(B)." *In re Jordan*, 927 F.2d at 224 (internal citations omitted).

In this particular case, the first financial statements of ROS were PXs 2 and 3, dated February 6, 1995. ROS also gave Plaintiff his financial statements of February 16, 1996 (PX 16) and January 27, 1997 (PX 29). These all showed the Ohio farm with no liens against it. PXs 2 and 3 put a value of $75,000 on the Ohio farm, PX 16 put a value of $103,000 on the Ohio farm, and PX 29 put a value of $175,000 on the Ohio farm. As indicated above, the mortgage lien against same in 1995, in favor of

ROS's parents, was at least $60,000. As indicated previously, the $300,000 lien was apparently never released until February 1997 (PX 50 at 2), and the $60,000 assumes that ROS's parents were gifting him and his wife with a total of $80,000 per year from 1993 forward. Further, while such PXs 2 and 3 financial statements showed no loans from his parents, ROS obtained a loan of $70,000 from his parents two days later on February 8, 1995. It appears that on or about February 6, 1995, the date of the first two financial statements, ROS knew that he was going to obtain such $70,000 loan from his parents momentarily. This was a significant omission from his financial statements. (PXs 2 and 3.)

The February 21, 1996 financial statement (PX 16) was inaccurate because it did not show the $115,000 in loans then outstanding to ROS from his parents, and it continued to show no debt against the Ohio farm.

PX 29 is ROS's January 29, 1997 financial statement. It was inaccurate because it failed to show the $115,000 in outstanding loans to him from his parents. As shown by PX 50, quoted above, the liens against the Ohio farm were not released until February 24, 1997, and were not shown.

It appears that all such financial statements were materially false. A financial statement is materially false if it "paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit.... [W]ritings with pertinent omissions may qualify as 'materially false' for purposes of § 523(a)(2)(B)." *In re Jordan*, 927 F.2d at 224 (internal citations omitted).

2. *Coston v. Bank of Malvern (In re Coston)*, 991 F.2d 257 (5th Cir.1993), overrules only *In re Jordan's* holding that reasonable reliance is a question of law and holds that it is a fact question.

### Reasonable Reliance

■ In *BancBoston Mortgage Corp. v. Ledford (In re Ledford)*, 970 F.2d 1556, 1560 (6th Cir.1992), the court discussed the following factor:

> Whether a creditor's reliance was reasonable is a factual determination to be made in light of the totality of the circumstances. Among the circumstances that might affect the reasonableness of a creditor's reliance are: (1) whether the creditor had a close personal relationship or friendship with the debtor; (2) whether there had been previous business dealings with the debtor that gave rise to relationship of trust; (3) whether the debt was incurred for personal or commercial reasons; (4) whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and (5) whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.

(internal citations omitted).

The Fifth Circuit, likewise, approved the Ledford-type factors. *See Coston v. Bank of Malvern (In re Coston)*, 991 F.2d 257, 261 (5th Cir.1993).

In the course of this decision, the Court has previously discussed and previously found some of the background facts in this area. In *Telco Leasing, Inc. v. Patch (In re Patch)*, 24 B.R. 563, 567 (D.Md.1982), the court stated:

> [T]he reasonableness of a creditor's reliance on a financial statement should be judged by comparing the creditor's actual conduct with (1) the creditor's own normal business practices, and (2) the standards and customs of the industry, (3) in light of the surrounding circumstances existing at the time the application was made and credit extended.

There was no evidence that Plaintiff had a prior relationship with the Debtors or otherwise had a close personal relationship or friendship with the Debtors that gave rise to a relationship of trust. Ms. Bowersock, the loan officer handling the loan to Craigmont for Plaintiff, is the wife of Richard Bowersock, an attorney who advised Craigmont and ROS on business matters. There was no testimony that Richard Bowersock and his wife communicated with one another at the inception of this loan, or otherwise about this loan. This was a commercial loan.

Even though it was not mentioned in any of the financial statements, neither side presented any significant testimony about the life estate reservation in the Ohio farm to ROS's parents (PX 49), nor did the proposed findings of fact and conclusions of law or briefing from either side mention this omission from the financial statements.

ROS's statement from PX 2, quoted above, says the gifting of the farm to Debtor and his brother "will be done at the end of 1997 at which time we will hold *complete ownership of the farm.* The approximate value of the farm is $295,000 on the open market." (Emphasis added.)

Aside from the life estate, it appears that the current status of the $300,000 lien given in 1993 by ROS and LES, and ROS's brother and wife, on the Ohio farm (PX 50) should have been stated in each of the financial statements, rather than being reflected as no liability.

In summary, as of the following initial and renewal notes, the following loans from ROS's parents, in the following amounts, were not reflected on ROS's following financial statements:

| Initial Loans Date/Amount | Renewal Notes Date/Amount | Financial Statement & Date | Parents' Loans Not Reflected on Financial Statements |
|---|---|---|---|
| 3/20/95 (PX 10) $100,000 | | PXs 2 & 3 2/6/95 | $ 85,000 |
| 12/19/95 (PX 15) $ 50,000 | | | $ 85,000 |
| | 3/20/96 renewal of 3/20/95 $100,000 note (PX 18) | PXs 2 & 3 2/6/95 PX 16 2/21/96 | $ 85,000 |
| | 9/16/96 renewal of 3/20/95 $100,000 note (PX 20) | PXs 2 & 3 2/6/95 PX 16 2/21/96 | $ 115,000 |
| | 12/26/96 renewal of $100,000 and $50,000 notes into $140,593.14 note (PX 22) | PXs 2 & 3 2/6/95 PX 16 2/21/96 PX 29 1/29/97 [3] | $ 115,000 |

The foregoing financial statements of ROS were reasonably relied upon by Plaintiff.

Such $115,000 of loans is reflected in ROS's cognovit note of $115,000 to his parents, dated January 28, 1998. (PX 51 at Ex. A.) The $50,000 balance of ROS's loans from his parents is reflected in his February 3, 1998 cognovit note to his parents. (PX 51 at Ex. B.)

ROS gave his parents a November 1997 mortgage against the Ohio farm to serve as collateral for the $50,000 note dated February 3, 1998 (PX 51 at Exs. B and D), and a January 28, 1998 mortgage against the Ohio farm to serve as collateral on the January 28, 1998 $115,000 note (PX 51 at Exs. A and C).

Plaintiff very possibly should have done some investigation of the paperwork surrounding the gifting of the Ohio farm interest. For example, a prudent lender would probably want to know whether the gifted interests being made were joint interests to ROS and his brother, possibly not subject to ready creditor levy, or how the gifts were to be memorialized. However, the concealment of the loans to ROS from his parents, on the financial statements reflected above, were in all likelihood the type of omissions that would not have been discovered through investigation. They were important in evaluating his credit status because they showed his inability to financially support the business loans from the inception. The financial statements did not show that his own investment in the business was made from loans repayable to his parents. Further, a prudent lender would realize that a debtor would generally try to repay his parents in preference to an independent lender, if the

**3.** See the testimony of Ms. Bowersock quoted above regarding this note.

business was not successful. This is borne out by his testimony quoted above, where ROS testified that his understanding, although not verbalized with his parents, was that his parents' loans were, at some time, going to be collateralized by liens on the Ohio farm. (PX 64 at 105–09.)

■ It appears that Plaintiff proved reasonable reliance under § 523(a)(2)(B)(iii). Even partial reliance is sufficient under such section. *Borg Warner Central Envtl. Systems, Inc. v. Nance (In re Nance)*, 70 B.R. 318, 323 (Bankr. N.D.Tex.1987).

### Intent to Deceive

■ In 4 *Collier on Bankruptcy* ¶ 523.08[2][e][ii] (15th ed. rev.3/98), it is stated:

> The explicit provision in paragraph (B)(iv) "with intent to deceive" merely highlights the necessity of establishing that intent to deceive is an essential element of the false financial statement exception. It must be shown that the debtor's alleged false statement in writing was either knowingly false or made so recklessly as to warrant a finding that the debtor acted fraudulently.
>
> The debtor's assertions of an honest intent must be weighed against natural inferences from admitted facts. The bankruptcy court may consider the totality of the circumstances to make an inference as to whether the debtor submitted a financial statement with an intent to deceive, in that reckless disregard for the truth or falsity of a statement combined with the magnitude of the resulting misrepresentation may combine to support the inference of an intent to deceive.

In *Norris v. First Nat'l Bank in Luling (In re Norris)*, 70 F.3d 27, 30 n. 12 (5th Cir.1995), it is stated: "Reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation may combine to produce the inference of intent [to deceive]."

Under the facts and circumstances as discussed above, it appears that ROS's reckless disregard for the truth, combined with the magnitude of the misrepresentations, *i.e.*, in this case the omissions of the financial statements, produced an inference of intent to deceive, thereby satisfying § 523(a)(2)(B)(iv).

Because the renewal of the entire note was obtained by ROS's false financial statement, the entire note is excepted from discharge. *In re Norris*, 70 F.3d at 29 n. 6.

### Attorney Fees

■ Plaintiff's attorney fees and expenses were set forth in PX 60. Through trial, they totaled $20,493.66, consisting of $18,911.30 in fees and $1,582.36 in expenses. Same encompassed some time spent on pre-bankruptcy state court litigation between the parties. Under the two guaranties (PXs 21 and 23), Plaintiff is entitled to recover its attorney fees. The $120 per hour rate charged by Mr. Rugeley, and the rates of his associates and paralegals are found to be reasonable. Mr. Rugeley's rates are below those normally observed being charged by counsel of comparable skill on comparable matters. The fee was fixed, and not contingent. Plaintiff's attorneys had skill and experience to handle this matter which was time-consuming, but not unduly complex. The record does not reflect whether Plaintiff was a regular client or a one-time client of Mr. Rugeley.

The attorney fees are cut in certain limited areas as noted below.

The total fees are cut $1,700 because the time on the billings is totaled at the end of

each bill, rather than following each entry. Many of the entries lack specificity, *e.g.*, conversation with _____, without describing what was discussed. Further, many of the entries themselves are clumped, making it difficult to determine whether the time spent on a particular task was reasonable. The tasks, as described, generally appear reasonable and necessary on a matter of this nature. Evaluating and prosecuting the claim also involved Plaintiff foreclosing on the collateral posted by Craigmont, consideration of possible litigation with ROS's parents, and discovery in connection with disposition of ROS's interest in the Ohio farm. The fee awarded is $17,211, plus expenses of $1,582, for a total of $18,793. Such fee and expenses are found reasonable and necessary under the facts and circumstances of this case.

### Other Contentions

Plaintiff raises other § 523(a)(2)(A)[4] contentions on the loans, and § 523(a)(6)[5] contentions in connection with ROS's alleged conversion of the 1993 Ford truck. As indicated, the Court denied Plaintiff any relief against LES, under any of the Plaintiff's theories, finding there was insufficient factual evidence to support same. The Court has granted Plaintiff full relief against ROS under § 523(a)(2)(B); therefore, it is unnecessary to address Plaintiff's other theories for relief against him, since, even if granted, it would merely substantially duplicate relief already granted under § 523(a)(2)(B).

Judgment for Plaintiff against ROS will be entered for the stipulated balance of $155,000, plus $18,793 for Plaintiff's attorney fees and expenses, plus interest per 28 U.S.C. § 1961(a), and denying Plaintiff any relief against LES.

---

4. *See generally AT & T Universal Card Services v. Mercer (In re Mercer),* 246 F.3d 391, 403 (5th Cir.2001); *Allison v. Roberts (In re Allison),* 960 F.2d 481, 483–84 (5th Cir.1992); and *RecoverEdge L.P. v. Pentecost,* 44 F.3d 1284, 1292–93 (5th Cir.1995).

5. *See generally Kawaauhau v. Geiger,* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998); *Miller v. J.D. Abrams Inc. (In re Miller),* 156 F.3d 598, 603 (5th Cir.1998); *Conseco v. Howard (In re Howard),* 261 B.R. 513 (Bankr. M.D.Fla.2001); *Rolex Watch U.S.A. v. Meece, (In re Meece),* 261 B.R. 403 (Bankr.N.D.Tex. 2001).