United States Court of Appeals,

Fifth Circuit.

No. 95-50213

Summary Calendar.

In the Matter of Robert William NORRIS and Emily Waller Norris, Debtors.

Robert William NORRIS, Appellant,

v.

FIRST NATIONAL BANK IN LULING, Appellee.

Dec. 4, 1995.

Appeal from the United States District Court for the Western District of Texas.

Before POLITZ, Chief Judge, and DUHÉ and PARKER, Circuit Judges.

POLITZ, Chief Judge:

Robert William Norris, a Chapter 7 bankruptcy debtor, appeals the district court's ruling that his debt to the First National Bank in Luling is not dischargeable in bankruptcy. Perceiving no error in the finding that this debt falls within the exception to dischargeability provided in 11 U.S.C. § 523(a)(2)(B), we affirm.

*Background*

In separate transactions in 1985 and 1986 Norris and his wife Emily Waller Norris bought a home and over 200 acres of land near Luling, Texas. These purchases were financed with loans from First National Bank in Luling. On November 1, 1986 the Norrises signed a note in the principal amount of $397,991.86, consolidating their existing obligations to First National. This note, which was secured by the Norris real estate near Luling, was due on December

1

1, 1988. The note contained a provision for annual renewal subject to bank approval.

Because of the substantial value of the real estate securing the note, and the respected position Norris held as a local family practitioner, First National summarily renewed the note in years 1989-1991. During this time Norris never missed a scheduled payment. In 1991 the Norrises moved their household to Austin, Texas and leased the Luling property. They continued to make timely payments to First National.

As part of the annual renewal process First National required Norris to provide a balance sheet, income statement, and current income tax return. The documentation submitted to the bank in conjunction with the 1992 loan renewal claimed that the Norrises had a "cash flow surplus" of $45,016. The financial statement represented that the Norrises therefore had $45,016 of discretionary income which would be available to service existing debts.

On December 23, 1992 Robert Norris, prompted by the fact that the declining real estate market had significantly reduced the value of the Luling property, wrote the bank reaffirming his commitment to servicing and ultimately retiring the note. First National renewed the note on December 31, 1992.

The Norrises, who had begun to experience marital problems in 1990, separated in May of 1993. Finding themselves unable to meet their financial obligations, they filed for Chapter 7 bankruptcy in September of 1993. The bankruptcy schedules revealed that the 1992

financial submissions were inaccurate. Specifically, the bankruptcy schedules demonstrated that although the Norrises had represented that they enjoyed a cash flow surplus of over $45,000 in late 1992,[1] in fact they were barely making ends meet and their subsequent marital difficulties had made their financial situation untenable.[2]

First National filed a complaint in the bankruptcy proceeding, contending that the debt was not dischargeable under section 523(a)(2)(B) because the Norrises had intentionally misled the bank by providing false information in their 1992 financial statement. After a trial on the merits, the bankruptcy court found that Emily Norris had not acted with any intent to deceive the bank and therefore the debt was dischargeable as to her. The bankruptcy court found the debt nondischargeable as to Robert Norris, who actually prepared the 1992 financial statement, concluding that he deliberately had misled the bank by providing misinformation to obtain the loan renewal. The district court, acting in its appellate role, affirmed the bankruptcy court's judgment, and Robert Norris timely appeals.

*Analysis*

---

[1]Although the financial documents were dated November 2, 1992, Norris argues that the information was not actually delivered to the bank until as late as December 28, 1992. The bank had this financial statement in its possession when it approved the loan on December 31, 1992.

[2]An "income and expense report" later prepared by Emily Norris from contemporaneous records and filed into the record of the bankruptcy proceedings showed a "cash flow surplus" of only $5,530.46 for fiscal year 1992.

3

When reviewing a bankruptcy court's factual findings which have been affirmed by the district court, we will reverse "only if, considering all the evidence, we are left with the definite and firm conviction that a mistake has been made."[3]  We review all conclusions of law *de novo.*

Section 523(a)(2)(B) of Title 11 of the United States Code creates a rule of nondischargeability for any debt

> for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by use of a statement in writing—
>
>> (i) that is materially false;
>>
>> (ii) respecting the debtor's or an insider's financial condition;
>>
>> (iii) on which the creditor to whom the debtor is liable for such ... credit reasonably relied;  and
>>
>> (iv) that the debtor caused to be made or published with intent to deceive.

The existence of each of these four elements is a question of fact[4] which the creditor must prove by a preponderance of the evidence.[5]

Norris contends that this exception is not applicable to the First National debt, despite the fact that Section 523(a)(2) expressly lists "renewal ... of credit" as one of the class of obligations excepted from discharge, because no "new" funds were disbursed in response to the 1992 financial statement.  Norris contends that a showing that the bank suffered damage as a

---

[3]*Matter of Young,* 995 F.2d 547, 548 (5th Cir.1993).

[4]*Matter of Coston,* 991 F.2d 257 (5th Cir.1993) (*en banc* ).

[5]*Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

4

proximate cause of the misleading financial statement is required before the debt may be declared nondischargeable.[6]

While one of the primary purposes behind the Bankruptcy Act is to "relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh,"[7] we may not cavalierly ignore the clearly expressed intent of Congress. The Supreme Court has observed that in fashioning the nondischargeability provisions "Congress evidently concluded that the creditors' interest in recovering full payments of debts in these categories outweighed the debtors' interest in a complete fresh start."[8] Because Norris has failed to advance any compelling

---

[6]Norris relies primarily upon *In re Siriani,* 967 F.2d 302, 304 (9th Cir.1992), in which a debtor's surety who relied upon false documentation in renewing the surety bond was required to prove "that damage proximately resulted from the misrepresentation" in order to have the debt declared nondischargeable. *See also In re Collins,* 946 F.2d 815 (11th Cir.1991). Unlike Norris, we do not read these cases as grafting onto section 523(a)(2) a proximate causation requirement; rather, we read them as applying the statutory mandate that qualifying debts are nondischargeable "to the extent obtained by" the fraudulent documentation. In this case, because the renewal of the entire note was "obtained by" Norris's false documentation, it is the entire note which is excepted from discharge. Insofar as these cases may stand for the proposition that the renewal of a preexisting debt, without more, does not fall within the purview of the statute, we join the First and Tenth Circuits in rejecting such an approach. *See In re Goodrich,* 999 F.2d 22 (1st Cir.1993) (expressly rejecting reasoning of *Siriani* ); *In re Gerlach,* 897 F.2d 1048 (10th Cir.1990). In addition, we note that such a "proximate causation" element would in many respects duplicate the "materiality" and "reasonable reliance" determinations required by section 523(a)(2)(B)(i) and (iv).

[7]*Williams v. U.S. Fidelity & Guar. Co.,* 236 U.S. 549, 554-555, 35 S.Ct. 289, 290, 59 L.Ed. 713 (1915).

[8]*Grogan, supra,* at 287, 111 S.Ct. at 659.

reason why we should construe the statute as meaning something other than what it says, we conclude that the 1992 "renewal of credit" falls within the class of debts eligible for nondischargeability.[9]

Norris next challenges the finding that the false information in the 1992 financial statement was materially false.[10] The bankruptcy judge found that the discrepancy between the 1992 financial statement and the subsequent revelations about the actual financial situation of the Norrises at that time was approximately $37,000. The bankruptcy court concluded that in light of the sums involved, this amount "would be a material discrepancy in everybody's book." We discern no error in this finding.

Norris also contends that the bank did not reasonably rely upon the statement. This contention challenges whether the bank in fact relied upon the statement. In support of his claim Norris points to the bank's pre-1992 practice of automatically renewing the note. The bankruptcy judge, however, credited the bank officers' testimony that in 1992 the substantial decline in the value of the collateral securing the loan caused them to rely to a greater extent than they previously had upon the Norris financial

---

[9]*Accord Goodrich, supra,* 999 F.2d at 26 ("Congress enacted a detailed statute without an explicit damage requirement.... In the face of conflicting policies for and against, there is no warrant for the court to add such a requirement.").

[10]A statement is materially false if it "paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit." *Jordan v. Southeast National Bank (In re Jordan),* 927 F.2d 221, 224 (5th Cir.1991) (quotation omitted).

statement. In addition, the bankruptcy judge also noted Norris's letter of December 23, 1992, in which he recognized the declining value of the collateral and gave the bank a personal assurance of payment. We find no error in the bankruptcy court's finding that the bank actually relied upon the statement.

We also agree that the bank's reliance was objectively reasonable. Norris maintains that the 1992 financial statement contained blatant errors which would have led a reasonably prudent bank to question the information. The bankruptcy judge disagreed, finding that the only obvious substantial error, an overestimation of the value of the Luling real estate, was one of which the bank already was aware. The bankruptcy judge concluded that the flawed financial statement was "not such a "red flag' as to invoke a duty to investigate."[11] This finding is adequately supported by the record.

Finally, Norris urges that he did not possess the requisite intent to deceive the bank when he completed and transmitted the loan renewal documents. Norris testified, however, that there had "been no extra money for the last couple of years" when he filled out the 1992 financial statement. The bankruptcy judge, after reviewing the financial statement in light of the bankruptcy record, concluded that "there was a reckless disregard for the truth."[12] We previously have stated, in the context of fraudulent

---

[11]*Young, supra,* 995 F.2d at 549.

[12]"Reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation may combine to produce the inference of intent

7

intent under section 523(a)(2)(A), that "[i]f the bankruptcy judge finds one version of events more credible than other versions, this Court is in no position to dispute the finding."[13]  Accordingly, we must find no error.

The judgment of the district court is AFFIRMED.

---

[to deceive]."  *In re Miller,* 39 F.3d 301, 305 (11th Cir.1994) (citations omitted).

[13]*Matter of Martin,* 963 F.2d 809, 814 (5th Cir.1992).