**In re Amanda TRIMBLE, Debtor.**

**First Citizens National Bank, Plaintiff**

**v.**

**Amanda Trimble, Defendant.**

**Bankruptcy No. 10–14408–DWH.
Adversary No. 10–1227.**

United States Bankruptcy Court,
N.D. Mississippi.

Aug. 24, 2012.

sold, Debtor does not provide evidence of efforts to at least sell the jet ski.

Milton D. Hobbs, Jr., Harris Shelton Hanover Walsh, PLLC, Oxford, MS, for Plaintiff.

Christian T. Goeldner, Southaven, MS, for Defendant.

*OPINION*

DAVID W. HOUSTON, III, Bankruptcy Judge.

On consideration before the court is a complaint to determine the dischargeability of a debt filed by the plaintiff, First Citizens National Bank ("First Citizens"), against the defendant/debtor, Amanda Trimble ("Trimble" or "debtor"); an answer to said complaint having been filed by Trimble; on proof in open court; and the court, having heard and considered same, hereby finds as follows to wit:

I.

The court has jurisdiction of the parties to and the subject matter of this proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157. This is a core adversary proceeding as defined in 28 U.S.C. § 157(b)(2)(I).

II.

Prior to trial, the parties stipulated to the following pursuant to a joint statement of undisputed facts filed on June 28, 2011:

1. Debtor borrowed $337,500 from First Citizens National Bank evidenced by a Promissory Note and Deed of Trust signed by Debtor. Her then husband was not a borrower.

2. In connection with the loan Debtor [sic] a Uniform Residential Loan Application was initialed, signed, and dated by Debtor.

3. The Uniform Residential Loan Application was given to First Citizens National Bank in [c]onnection with the Debtor's loan evidenced by the Promissory Note and Deed of Trust.

4. The Debtor provided the information contained in the Uniform Residential Loan Application.

5. The proceeds of the Promissory Note were used to purchase real estate located at 1259 Vinton Avenue, Memphis, Tennessee 38014 (the "Property").

6. The Debtor never moved to live in the Property.

7. The Uniform Residential Loan Application contains the following information compared to actual: (i) Debtor's monthly income was $13,879 in 2007; her actual income pursuant to her 2007 Form 1040 was approximately $4800 per month; (ii) Debtor leased her existing home at 2857 Summit Drive, Hernando, Mississippi 38632; Debtor never leased her home at 2857 Summit Drive, Hernando, Mississippi 38632[;] (iii) Debtor did not borrow the down payment;

Debtor either borrowed or was given the down payment by a third party.

8. Debtor was a real estate agent at the time of obtaining the loan.

9. Debtor's then husband was a "mortgage broker" for a mortgage business created by the Debtor. He could not get bonded because of a prior bankruptcy.

10. Debtor's 2007 joint tax return, Schedule C (Form 1040) listed Debtor as a mortgage broker with gross sales of $58,483.

11. Debtor's 2007 joint tax return, Schedule E (Form 1040) showed the Property as rental property.

12. Debtor's 2007 joint tax return, Schedule S, listed Debtor with a net profit of $29,797.

13. Debtor's 2007 Mississippi Income Tax Return listed $29,797 total income for Debtor.

14. First Citizens National Bank foreclosed on the Property on August 22, 2008.

15. First Citizens National Bank filed suit for the deficiency balance in the Circuit Court of Shelby County, Tennessee for the Thirtieth Judicial District at Memphis under Case No. CT–005298–08. A judgment was entered into in the amount of $51,453.04.

16. The debt to First Citizens National Bank was $53,754.13 at the time of commencement of this case. Interest pursuant to the Note continues to accrue at ten percent (10%) per annum and the Note provides for reasonable attorney's fees for its collection.

In addition, pursuant to a trial stipulation (Exhibit P–2), the parties stipulated as to the accuracy of the following amounts as of May 21, 2012:

1. Principal amount of debt = $38,091.09.

2. Interest and late fees = $19,012.60.

3. Attorney fees (only through April 30, 2012) and court costs = $9,312.21.

4. Total owed = $66,415.90.

5. Per diem interest accrual = $6.88.

III.

In its complaint, First Citizens objects to the dischargeability of the debt owed by Trimble pursuant to 11 U.S.C. § 523(a)(2)(B), or in the alternative, pursuant to § 523(a)(2)(A)[1]. These code sections are set forth as follows:

§ 523. Exceptions to discharge

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

. . . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money,

---

1. Hereinafter, all Code sections cited in this opinion will be considered as sections of the United States Bankruptcy Code unless specifically designated otherwise.

property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive[.]

§ 523(a)(2)(A)–(B).

### IV.

As noted above, the debtor applied for and obtained a loan in the amount of $337,500.00 from First Citizens to purchase a home located in Memphis, Tennessee. She initiated the loan application process through a telephone conversation with Kacey C. Kidd, ("Kidd"), a loan originator employed by First Citizens. During the telephone conversation with Kidd, the debtor provided information regarding her income, assets, and employment, as well as, information related to the property to be purchased.

The debtor signed a Uniform Residential Loan Application, (Exhibit P–3), in order to obtain the loan. The application included a column in which to list the borrower's monthly income, as well as, a separate column to include the income of a co-borrower. In the column provided for the borrower, the debtor set forth a gross monthly employment income of $13,879.00. There was no co-borrower on the loan application, so the column applicable to the co-borrower was left blank. However, the debtor testified that the $13,879.00 figure she provided to Kidd was derived by adding her monthly income to the monthly income of her spouse who was obviously not a co-borrower.

On their 2007 joint tax return Schedule C, Profit or Loss From Business, (Exhibit P–4), the debtor reported gross income of $58,483.00, and her spouse reported gross income of $100,720.00. Using the amounts on Schedule C, the monthly gross income for both the debtor and her spouse would total approximately $13,267.00 per month.

The loan application reflects a net monthly rental income of $9.00 per month. At the time she executed the loan application, the debtor lived in a home located in Hernando, Mississippi. The debtor testified that she informed Kidd of her intention to rent the Hernando property for $3,000.00 per month after she purchased the home located in Memphis. She indicated that she obtained a rental agreement for the Hernando property prior to the loan closing, but the potential tenant never occupied the property, nor paid any rent. The $9.00 net monthly rental income amount set forth on the loan application was calculated by deducting the mortgage payment, insurance premiums, maintenance costs, and taxes applicable to the Hernando property from the anticipated $3,000.00 rental income which was never realized.

After the debtor's loan application was approved, she executed the note and deed of trust on November 8, 2007. Not long thereafter, she defaulted, and First Citizens foreclosed on the property on August 22, 2008. First Citizens then filed suit against the debtor for the deficiency in the Circuit Court of Shelby County, Tennessee, and obtained a judgment in the amount of $51,453.04. The debtor filed for relief under Chapter 7 of the Bankruptcy Code on September 13, 2010.

### V.

First Citizens originated the loan to the debtor with plans to immediately sell the loan to Countrywide Home Loans, ("Countrywide"), as part of its "stated income/stated asset" loan program. "Stated income/stated asset" loans allowed borrowers to provide income and asset information to their lenders with little or no supporting documentation. *See New Jersey Carpenters Vacation Fund, et al. v. Royal Bank of Scotland Grp., PLC,* 720

F.Supp.2d 254, 269 (S.D.N.Y. March 26, 2010). Although the borrower's income is not verified, the stated income amount should be reasonable when considering the borrower's employment. *See id.* Under this program, borrowers routinely inflated their income levels. *See id.*

Kidd's deposition testimony, (Exhibit P–1), confirmed that she communicated with the debtor solely by telephone during the loan application process. Although Kidd did not specifically remember the debtor, she provided an overview of the loan application and approval process for First Citizens at the time of the debtor's loan. It is summarized as follows:

1. As a loan originator, Kidd would originate loans for the bank to be sold on the secondary market. At the time of the debtor's loan, Kidd did not make "in-house" loans. Instead, all loans were made to be sold to bigger companies, such as FHA, Fannie Mae, Freddie Mac, and Countrywide.

2. Ultimately, the lending decision was made by the investor to which the bank intended to sell the loan. The bank would close the loan and retain liability until the loan was sold to the investor.

3. Kidd would collect information from the borrower in person, by phone, or by mail, and transfer the collected information onto the loan application documents. She would then assign the file to a loan processor who would verify employment, obtain a credit report, order an appraisal and a title opinion, and then send the file to underwriting.

4. For a "stated income/stated asset" loan, the prospective borrower would provide income information, but the bank did not verify its accuracy. Instead, the bank would rely on the information provided by the loan applicant, coupled with the employment verification and the credit report.

5. This type loan was processed through Countrywide's underwriting system. However, Kidd would typically make sure the information provided by the borrower "fell within the parameters or guidelines that were set in place by Countrywide."

6. A loan processor pulled Trimble's credit report and verified her employment, but neither of these sources revealed Trimble's actual income.

7. The lender was not allowed to ask for tax returns or to verify income information under this loan program. As such, the bank relied on the borrower to be truthful and to provide accurate information. If ascertained by the bank, the provision of untruthful or inaccurate information would have a negative impact on the loan decision.

8. Kidd stated she would not have made a loan if a borrower lied to her.

9. In the normal process of obtaining approval for Trimble's loan, nothing raised "red flags" to put the bank on notice that any information was incorrect. Additionally, Kidd had no reason to doubt that a real estate agent's monthly income was $13,789.00 in 2007, the time the debtor obtained her loan.

10. First Citizens received an approval notice for the loan closing from the underwriter. Kidd did not remember the reason for Countrywide's refusal to purchase the loan.

First Citizens provided additional insight in its responses to interrogatories propounded by the debtor (Exhibit D–1). The Countrywide guidelines did not require income verification because the debtor's credit scores were sufficient to qualify her for the "stated asset/stated income" loan. After receiving approval to close the loan from Countrywide's underwriting system, First Citizen submitted the loan to Countrywide for purchase. However, due to an appraisal issue, Countrywide declined to purchase the loan.

## VI.

 The court notes that the debtor offered no evidence to contradict Kidd's deposition testimony, nor did the debtor dispute any other evidence offered by First Citizens at trial. Instead, the debtor argued that First Citizens could not meet its burden of proof because the debtor's false statements were not the proximate cause of First Citizens' loss. In support of this argument, the debtor pointed out that absent the appraisal issue, it would be Countrywide, not First Citizens, to which the debtor would be liable. The Fifth Circuit has previously rejected grafting a proximate causation requirement onto § 523(a)(2). *See Norris v. First Nat'l Bank in Luling (In re Norris)*, 70 F.3d 27, 29 n. 6 (5th Cir.1995). The debtor in *Norris* asserted that "a showing that the bank suffered damage as a proximate cause of the misleading financial statement is required before the debt may be declared nondischargeable." *Id.* at 29. In rejecting this approach, the Fifth Circuit stated that "such a 'proximate causation' element would in many respects duplicate the 'materiality' and 'reasonable reliance' determinations required by § 523(a)(2)(B)(i) and (iv)." *Id.* at 29 n. 6.

 Therefore, this court, relying on the instructive language of the Fifth Circuit, finds no merit in the debtor's argument that First Citizens failed to meet its burden of proof due to a failure to show proximate causation. This finding, however, does not relieve First Citizens of its burden to prove each of the elements of nondischargeability underpinning a § 523(a)(2) claim by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

## VII.

As a general rule, "all debts arising prior to the filing of the bankruptcy petition will be discharged." *United States v. Coney*, 689 F.3d 365, 371 (5th Cir.2012) (citing *In re Bruner*, 55 F.3d 195, 197 (5th Cir.1995)). "However, to ensure that the Bankruptcy Code's 'fresh start' policy is only available to 'honest but unfortunate debtor[s],' Congress has provided that certain types of liabilities are excepted from the general rule of discharge." *Id.* "Congress evidently concluded that the creditors' interest in recovering full payment of debts in these categories outweighed the debtors' interest in a complete fresh start." *Norris v. First Nat'l Bank in Luling*, 70 F.3d 27 at 30.

First Citizens asserts that the debt owed by Trimble is excepted from discharge pursuant to § 523(a)(2)(B), or alternatively § 523(a)(2)(A). The Fifth Circuit recently noted the difference between these two provisions in *Bandi v. Becnel (In re Bandi)*, 683 F.3d 671, 673–675 (5th Cir.2012):

> Section 523(a)(2)(A) provides that certain debts obtained by false pretenses, a false representation, or actual fraud are nondischargeable but excludes from its coverage "a statement respecting the debtor's ... financial condition." Section 523(a)(2)(B) provides that certain debts obtained by a false "statement in

writing ... respecting the debtor's financial condition" are nondischargeable.

. . . .

The Supreme Court has described these two subsections as "two close statutory companions barring discharge," the first of which pertains to fraud "not going to financial condition" and the second of which pertains to "a materially false and intentionally deceptive written statement of financial condition upon which the creditor reasonably relied."

██ In order to prevail on its primary claim that the debt is nondischargeable under § 523(a)(2)(B), First Citizens must prove the underlying four elements by a preponderance of the evidence. *In re Norris*, 70 F.3d at 29. The debt will be nondischargeable to the extent it is obtained by the use of a written statement:

 (i) that is materially false;

 (ii) respecting the debtor's or an insider's financial condition;

 (iii) on which the creditor to whom the debtor is liable for such ... credit reasonably relied; and

 (iv) that the debtor caused to be made or published with intent to deceive.

*Id.; see also Gen. Elec. Capital Corp. v. Acosta (In re Acosta)*, 406 F.3d 367, 374 (5th Cir.2005).

██ A statement is materially false if it "paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit." *Jordan v. Se. Nat'l Bank (In re Jordan )*, 927 F.2d 221, 224 (5th Cir.1991); *see also In re Norris*, 70 F.3d at 30 n. 10.

██ The term "financial condition" as used in § 523(a)(2)(B)(ii), means "the general overall financial condition of an entity or individual[.]" *In re Bandi*, 683 at 676.

Under § 523(a)(2)(B), ... "intent to deceive may be inferred from use of a false financial statement." *In re Young*, 995 F.2d 547, 549 (5th Cir.1993). A judge may look at the totality of the circumstances and infer an intent to deceive when "[r]eckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation may combine" to produce such an inference. *Norris v. First Nat'l Bank (In re Norris)*, 70 F.3d 27, 31 n. 12 (5th Cir.1995) (quoting *In re Miller*, 39 F.3d 301, 305 (11th Cir.1994)). *Morrison v. W. Builders of Amarillo, Inc. (In re Morrison)*, 555 F.3d 473, 482 (5th Cir.2009).

## VIII.

██ The court will first address whether the written statement used by Trimble was materially false with respect to her financial condition, and was made or published with an intent to deceive. It is obvious that Trimble's loan application was a statement respecting her financial condition as defined by *In re Bandi*. On the loan application, the debtor overstated her income by more than 250% when she indicated that her gross monthly income was $13,879.00 per month. In fact, it was approximately $4,800.00 per month. In doing so, the debtor painted a substantially untruthful picture of her financial condition by misrepresenting information of the type which would normally affect the decision to grant credit. *In re Jordan*. Although the court may infer an intent to deceive as discussed in *In re Morrison*, there is no need to do so because Trimble's intent to deceive is blatantly obvious by her own admissions. She testified that, as a real estate agent, she was familiar with the level of income required to qualify for loan approval, and then admitted that she overstated her income information in order to meet the income requirement. Conse-

quently, First Citizens has unquestionably met elements (i), (ii), and (iv) required by § 523(a)(2)(B).

## IX.

 The final element that that First Citizens must establish is reasonable reliance. Under § 523(a)(2)(B), the determination of the reasonableness of a creditor's reliance is to be made "in light of the totality of the circumstances." *Coston v. Bank of Malvern (In re Coston)*, 991 F.2d 257, 261 (5th Cir.1993) (en banc). However, before making a determination on whether the reliance was reasonable, the court must first determine whether the reliance was actual:

> The reliance component of § 523(a)(2)(B) is a two-step analysis: (1) the creditor must first show that it actually relied on the financial statement and (2) that reliance must be reasonable. To establish actual reliance, the creditor must show its reliance on the false financial statement was "a contributory cause of the extension of credit and that credit would not have been granted if the lender had received accurate information." Although actual reliance must be demonstrated, a creditor does not have to show that it relied exclusively on the false financial statement. It is sufficient if the creditor establishes that it partially relied on the false statement.

*Colo. E. Bank & Trust v. McCarthy (In re McCarthy)*, 421 B.R. 550, 560–61 (Bankr. D.Colo.2009) (internal footnotes omitted).

 In utilizing this two-step analysis, the court turns again to Kidd's deposition testimony. Kidd testified that, as the loan originator, she would ensure the information provided by the borrower fell within certain guidelines and parameters promulgated by Countrywide under its "stated income/stated asset" loan program. One such parameter, which was known by the

debtor according to her own admission, was a certain level of income. First Citizens relied on the debtor's inflated income level, among other things, to determine the debtor's eligibility before submitting the loan application to Countrywide for approval. The debtor acknowledged that without such an overstatement of her income she would not have qualified for the loan. As such, the court finds that the income level provided by the debtor was a significant cause in her obtaining the loan approval, and that she would not have obtained the loan had she provided accurate information. Therefore, the court is of the opinion that that First Citizens actually relied on the debtor's materially false financial statement.

 In addition to actual reliance, First Citizens must also show that its reliance was reasonable. "The issue of reasonableness is not whether it was reasonable for the [b]ank to have made the [loan] to the [d]ebtor, but whether it was reasonable for the [b]ank to have relied upon the [d]ebtor's financial statements in making the [loan]." *In re McCarthy*, 421 B.R. at 562. Ultimately, the reasonableness of a creditor's reliance rests on the particular facts of each case. *In re Coston*, 991 F.2d at 261.

> The bankruptcy court may consider, among other things: whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.

*Id.*

In agreeing with the factors articulated by the Fifth Circuit in *In re Coston*, the

Court of Appeals for the Third Circuit added two factors relating to the standard practices and customs of the creditor and the creditor's industry. *See Insurance Co. of N. America v. Cohn (In re Cohn)*, 54 F.3d 1108, 1117 (3d Cir.1995).

> The reasonableness of a creditor's reliance under § 523(a)(2)(B) is judged by an objective standard, i.e., that degree of care which would be exercised by a reasonably cautious person in the same business transaction under similar circumstances.
>
> A determination of reasonable reliance requires consideration of ... (1) the creditor's standard practices in evaluating credit-worthiness (absent other factors, there is reasonable reliance where the creditor follows its normal business practices); (2) the standards or customs of the creditor's industry in evaluating credit-worthiness (what is considered a commercially reasonable investigation of the information supplied by debtor[.])

*Id.* (citations omitted).

■ When considering relevant factors, a court may find a creditor's reliance was reasonable where nothing in the financial statement presents a "red flag" that would invoke a duty to investigate. *See Young v. Nat'l Union Fire Ins. Co.*, 995 F.2d 547, 549 (5th Cir.1993); *see also In re McCarthy*, 421 B.R. at 562.

■ It is significant that First Citizens did not exclusively rely on the information provided by the debtor in the loan application process. Kidd stated that she would first ensure that the information provided by a prospective borrower fell within the program guidelines established by Countrywide. Because Trimble's income was not verified, the bank depended on other sources to determine her eligibility. First Citizens obtained a credit report and verified Trimble's employment prior to submitting the application to Countrywide. In its responses to interrogatories, First Citizens asserted that Trimble's credit scores were sufficient to qualify her for the "stated income/stated asset" loan program. Additionally, she had "purportedly" unborrowed funds available to make the down payment for the home purchase in the amount $37,500.00.

Furthermore, Kidd testified that she had no reason to doubt that a real estate agent's monthly income in 2007 was $13,879.00. She also testified that there were no "red flags" to put the bank on notice that the information provided by Trimble in the loan application was incorrect. Kidd stated that she would not have made a loan if she were aware that Trimble had lied to her.

In hindsight, it is now known that inherent problems existed with the "stated income/stated asset" loan program. By its very definition, a "stated income/stated asset" loan required the lender to partially rely on the income and assets "stated" by the borrower in the loan application. However, these loans were commonly utilized in the lending industry and available to borrowers when Trimble obtained her loan. First Citizens sold these loans not only to Countrywide, but to FHA, Fannie Mae, and Freddie Mac as well. Although in retrospect the practices utilized in the "stated income/stated asset" loan program were perhaps not the most prudent, the court finds that these practices were consistent with the standards or customs of the lending industry at that time. As a seasoned real estate agent, Trimble knew how to manipulate the borrowing procedures of this loan program and did so. Accordingly, the court finds that the totality of the circumstances indicates that the reliance by First Citizens on the debtor's materially false financial information was reasonable.

### X.

The court is of the opinion that First Citizens has met is burden in proving that the debt owed by the debtor is nondischargeable under § 523(a)(2)(B). Because of this conclusion, the court will not consider at this time the alternative claim of nondischargeability asserted by First Citizens pursuant to § 523(a)(2)(A).

A judgment in the sum of $57,103.69, ($38,091.09 plus $19,012.20), which represents the principal balance plus interest and late fees accrued as of May 21, 2012, shall be awarded in favor of First Citizens against Trimble consistent with this opinion. Said judgment shall be a nondischargeable debt in Trimble's bankruptcy case pursuant to § 523(a)(2)(B). Interest shall accrue thereon from the date of entry of said judgment at the highest rate permitted by state law.

Although the parties stipulated that attorney fees and court costs had accrued as of April 30, 2012, in the sum of $9,312.21, the court is unaware as to whether this amount was considered reasonable or necessary. Therefore, the attorney representing First Citizens shall submit an itemization of his fees and expenses to the court, with a copy to the debtor's attorney, within 20 days of the date of this opinion. The debtor's attorney shall have 10 days thereafter to object to the reasonableness and necessity of said fees and expenses. The court will then enter a separate judgment finalizing the award.

An order, consistent with this opinion, shall be entered contemporaneously herewith.