# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
March 10, 2020

Lyle W. Cayce
Clerk

No. 19-10479

In the Matter of: JOHN A. OSBORNE

> Debtor

VERITEX COMMUNITY BANK,

> Appellant

v.

JOHN A. OSBORNE,

> Appellee

Appeal from the United States District Court
for the Northern District of Texas

Before DAVIS, SMITH, and STEWART, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Under the Bankruptcy Code, certain debts may be excepted from discharge. This case centers on 11 U.S.C. § 523(a)(2)(B), the exception for money obtained by means of a fraudulent written statement concerning the debtor's financial condition. Appellant Veritex Community Bank ("Veritex") filed an adversary proceeding requesting that Appellee Dr. John Osborne's ("Osborne") debt not be discharged because he furnished the bank a materially false written financial statement. The bankruptcy court found that the

No. 19-10479

statement was indeed false and submitted with the intent to deceive. But the court nevertheless discharged Osborne's debt, finding that Veritex did not reasonably rely on Osborne's statement. The district court affirmed, and Veritex now appeals. For reasons set forth below, the bankruptcy court's finding that Veritex did not reasonably rely on Osborne's statement is clearly erroneous. We therefore REVERSE the district court's judgment granting a discharge to Osborne and RENDER judgment in favor of Veritex.

## I.  BACKGROUND

In June 2012, Osborne, a cardiologist, formed State of the Heart PLLC ("SOTHC"). In need of funding, SOTHC, through Osborne, requested a loan of $500,000 from Veritex, a regional bank in Texas.[1] Osborne and Veritex had no prior relationship. Veritex required Osborne to personally guarantee the loan. As part of the loan application, Osborne and his wife Karen provided David Wood, a commercial loan officer at Veritex, a personal financial statement on August 3, 2012.[2] The statement required Osborne to notify the bank of any material unfavorable change in his financial condition. Osborne also informed Wood that SOTHC would be leasing a CT scanner. Based on the information Osborne furnished, Veritex loaned SOTHC $500,000 on September 12, 2012, and the Osbornes personally guaranteed it.

On September 10, 2012, two days before the loan closed, Osborne and SOTHC entered into a lease with Phillips Medical Capital, LLC ("PMC").[3]

---

[1] Osborne actually contacted Independent Bank of Texas ("IBT"); Veritex acquired IBT in July 2015. For purposes of this opinion, we refer to the bank by its present-day name.

[2] His total assets were listed at $2,130,210. His total liabilities amounted to $653,500. His listed net worth totaled $1,476,720. Karen died during these proceedings and is not a party as a result.

[3] Although PMC and Osborne were discussing the loan by this point, it is unsettled if the lease and guaranty were in fact signed on this date. PMC only signed the Lease Agreement itself on October 29, 2012. The bankruptcy court found it was unclear if Osborne signed then.

2

No. 19-10479

Under that agreement, PMC leased $1,000,000 of medical equipment to SOTHC. The Osbornes signed a personal guarantee backing SOTHC's agreement, but they did not update the financial statement they provided to Veritex to indicate their personal guarantee under the PMC lease.

On July 15, 2013, SOTHC defaulted on its lease with PMC. PMC, SOTHC, and the Osbornes entered into a settlement agreement on July 31, 2013. SOTHC and Osborne failed to make the payments per that agreement, however, and a Pennsylvania court entered a judgment by confession in favor of PMC on October 16, 2013. The judgment determined the Osbornes were liable to PMC for $2,139,988.31, plus an interest rate of eighteen percent.

The Osbornes never informed Veritex of these developments. Instead, in September 2013, Osborne requested that Veritex extend SOTHC's loan after failing to pay it off when it matured. Veritex agreed to an initial sixty-day extension of the loan upon its expiration on September 12, 2013, so that it could obtain and assess the Osbornes' and SOTHC's updated financial information. It requested another personal financial statement from Osborne before deciding to extend the loan. On September 27, 2013, Karen Osborne provided another net worth statement to Veritex in the form of a one-page Excel spreadsheet that listed the Osbornes' assets and liabilities, with a net worth of $1,533,826. Osborne also provided a more comprehensive set of financial records on SOTHC. The Osbornes' personal financial statement made no mention of their guarantee of the PMC loan or their subsequent default. When the Pennsylvania court entered judgment against the Osbornes, they did not update their statement to reveal the judgment.

There is no doubt that John Osborne was aware of the submission of the 2013 financial statement, as he discussed the loan with Wood in December. On December 23, 2013, Wood met with the Osbornes and Karen's father to review the status of the loan and SOTHC's business operations. At no point in the

meeting did Osborne reveal his default on the PMC lease or the judgment rendered against him. While the Osbornes would later provide updated financial statements for SOTHC, they never updated their personal financial statement to reflect the judgment.

This December meeting was illustrative of Veritex's efforts to conduct its own investigation as it deliberated whether or not to renew the loan. For example, it obtained a credit report on the Osbornes dated October 24, 2013, from a national credit reporting agency. The 712 credit score showed that Osborne's credit had improved by two points since his previous credit score report in August 2012, and it revealed nothing of the judgment against him. Wood also emailed Karen and her father after meeting in person to confirm the Osbornes' personal liquidity during the renewal process and to inquire further about their financial statement.

After reviewing both the Osbornes' and SOTHC's financial information, Veritex agreed to a second, renewed loan to SOTHC on March 12, 2014, for one year. A month later, on April 21, 2014, SOTHC filed for Chapter 11 bankruptcy. The Osbornes filed for Chapter 7 bankruptcy soon thereafter. Veritex then commenced an adversary proceeding against Osborne, asking that Osborne not be discharged from the debt to Veritex under 11 U.S.C. § 523(a)(2)(B), which prevents a debtor from discharging a debt obtained through a materially false written statement. In its adversary complaint, Veritex argued that before the loan renewal, the Osbornes made no mention of their guarantee of the PMC lease, nor did they ever reveal the default on that lease or the subsequent judgment rendered against them.

The bankruptcy court reviewed Veritex's initial loan documents and ensuing extension. It found that Osborne did not intend to deceive Veritex when he first applied for a loan without revealing he personally guaranteed a lease for medical equipment, and also that in any event, Veritex did not

No. 19-10479

reasonably rely on Osborne's statement. As to the renewed loan, the court found that the statement Karen submitted was false and that she intended to deceive Veritex. The court then held that Karen's intent to deceive could be imputed to Osborne because she acted as his agent. Nevertheless, the court held that Veritex's reliance was not reasonable, and therefore Osborne was entitled to discharge his debt. The district court affirmed, finding the bankruptcy court's account of the evidence plausible.[4] Veritex timely appealed.

## II.  DISCUSSION

### A.  Reasonable Reliance

Under 11 U.S.C. § 523(a)(2)(B), a debt is exempted from discharge if it was obtained by (1) a written statement; (2) that is materially false; (3) respecting the debtor's or an insider's financial condition; (4) on which the creditor to whom the debtor is liable for such credit reasonably relied; and (5) that the debtor caused to be made or published with the intent to deceive. On appeal, Veritex argues that, contrary to the bankruptcy court's and district court's findings, its reliance on Osborne's materially false written statements was reasonable, and that Osborne's debt should therefore be exempt from discharge.

The district court's and bankruptcy court's conclusions of law are reviewed de novo; the bankruptcy court's findings of facts are reviewed for clear error.[5] This court has held that determining the reasonableness of a creditor's reliance under § 523(a)(2)(B) is a question of fact that the creditor must prove by a preponderance of the evidence.[6] "When reviewing a bankruptcy court's

---

[4] *Veritex Cmty. Bank v. Osborne*, No. 4:18-CV-00129-O, 2019 WL 1382646, at *4 (N.D. Tex. Mar. 27, 2019).

[5] *In re Pratt*, 524 F.3d 580, 584 (5th Cir. 2008).

[6] *Coston v. Bank of Malvern (In re Coston)*, 991 F.2d 257, 259 (5th Cir. 1993) (en banc) (per curiam); *Norris v. First National Bank in Luling (In re Norris)*, 70 F.3d 27, 29 (5th Cir. 1995).

factual findings which have been affirmed by the district court, we will reverse 'only if, considering all the evidence, we are left with the definite and firm conviction that a mistake has been made.'"[7] We will not reverse the bankruptcy court if its "account of the evidence is plausible in light of the record viewed in its entirety."[8]

The Supreme Court has repeatedly emphasized that the Bankruptcy Code "limits the opportunity for a completely unencumbered new beginning to the 'honest but unfortunate debtor.'"[9] Consistent with this understanding, Congress intended the "reasonable reliance" requirement of § 523(a)(2)(B) to target creditors acting in bad faith to prevent debtors from discharging debts.[10] Looking to legislative history, the Supreme Court noted that Congress was wary of the "potential of financial statements to be misused not just by debtors, but by creditors who know their bankruptcy law."[11] The Court observed that "consumer finance companies frequently collected information from loan applicants in ways designed to permit the companies to later use those statements as the basis for an exception to discharge," such as having debtors list their debts on forms with too little space.[12] Congress, then, wanted to "moderate the burden" on dishonest debtors because "the relative equities

---

[7] *Norris*, 70 F.3d at 29 (quoting *Young v. National Union Fire Insurance Co. of Pittsburgh (In re Young)*, 995 F.2d 547, 548 (5th Cir. 1993)).

[8] *In re Coston*, 991 F.2d at 262 (quotation marks omitted).

[9] *Grogan v. Garner*, 498 U.S. 279, 287 (1991) (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)).

[10] H.R.Rep. No. 95-595, 1st Sess. at 130–31 (1977) ("It is a frequent practice for consumer finance companies to take a list from each loan applicant of other loans or debts that the applicant has outstanding. While the consumer finance companies use these statements in evaluating the credit risk, very often the statements are used as a basis for a false financial statement exception to discharge. . . . Most often there has been no intent to deceive on the part of the debtor, and, as in so many aspects of the creditor-debtor relationship, the debtor has simply followed the creditor's instructions with little understanding of the consequences of his action.") (footnote omitted).

[11] *Field v. Mans*, 516 U.S. 59, 76 (1995).

[12] *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1764 (2018).

No. 19-10479

might be affected by practices of consumer finance companies, which sometimes have encouraged such falsity by their borrowers for the very purpose of insulating their own claims from discharge."[13]

In *In re Coston*, we recognized reasonable reliance is determined by the "totality of the circumstances."[14] We set forth three factors, among other things, a bankruptcy court may consider in assessing the reasonableness of a creditor's reliance under § 523(a)(2)(B).[15] First, the court can look to whether "there had been previous business dealings with the debtor that gave rise to a relationship of trust."[16] Second, the court can consider "any 'red flags' that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate."[17] Third, the court can ask if "even minimal investigation would have revealed the inaccuracy of the debtor's representations."[18]

This court has not exhaustively explored the facts that might give rise to a finding of reasonable reliance. In *In re Norris*, the court found that the debtor's financial statement contained only one obvious substantial error, of which the bank was already aware, and that the flawed financial statement therefore did not invoke a duty to investigate.[19] Similarly, in *In re Young*, this court held that whiteouts and handwritten additions to a typed financial statement were "not such a 'red flag' as to invoke a duty to investigate."[20] In

---

[13] *Field*, 516 U.S. at 76–77. The Bankruptcy Code's congressional history also notes that creditors can take measures to protect themselves against fraudulent statements—they "often [have] other sources of information, such as credit bureau reports, to verify the accuracy of the lists of debts." H.R.Rep. No. 95-595 at 130.

[14] 991 F.2d 257, 261 (5th Cir. 1993) (en banc) (per curiam).

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] 70 F.3d 27, 30 (5th Cir. 1995).

[20] 995 F.2d 547, 549 (5th Cir. 1993).

both cases, we upheld the bankruptcy court's findings that the creditor reasonably relied on the debtor's materially false statement.

While we have not further expanded on the reasonable reliance requirement, our sister circuits have emphasized that the creditor's burden here should not be an onerous one. The Second Circuit, for example, has held that the reasonableness requirement is "a low hurdle for the creditor to meet, and is intended as an obstacle only for creditors acting in bad faith."[21] The Ninth Circuit has echoed this reasoning. In *In re Lansford*, the court found no clear error in the district court's determination that a bank reasonably relied on misrepresentation.[22] "Having intentionally misled the sellers in an area he knew was important to them, it is unseemly for [the debtor] now to argue that he should be excused from section 523 because the sellers believed him."[23] The Sixth Circuit has likewise determined that reasonable reliance "cannot be said to be a rigorous requirement, but rather is directed at creditors acting in bad faith."[24] And the Supreme Court has observed that the "heightened requirements for nondischargeability under § 523(a)(2)(B) were intended to

---

[21] *Bonnanzio v. National Union Fire Insurance Co. of Pittsburgh, Pa. (In re Bonnanzio)*, 91 F.3d 296, 305 (2d Cir. 1996) (quoting *Shaheen v. Hong Kong Deposit and Guaranty Co. Ltd. (In re Shaheen)*, 111 B.R. 48, 53 (S.D.N.Y.1990)) (quotation marks omitted). The court remanded to the bankruptcy court to determine whether the creditor's reliance was reasonable. *Id.*

[22] *Trattoria, Inc. v. Lansford*, 822 F.2d 902, 904 (9th Cir. 1987). *See also Thul v. Ophaug (In re Ophaug)*, 827 F.2d 340, 343 (8th Cir. 1987) ("While . . . the underlying policy of the Bankruptcy Code is to give honest debtors a fresh start, we do not believe that we need strictly construe the provisions of the Code in favor of dishonest debtors.").

[23] *In re Lansford*, 822 F.2d at 904. The court further found that, assuming there was a duty to investigate, the creditor reasonably did so by visiting the real estate project and checking property records. *Id.*

[24] *Martin v. Bank of Germantown (In re Martin)*, 761 F.2d 1163, 1166 (6th Cir. 1985). The Sixth Circuit held that because the loan was small, the creditor had prior business dealings with the debtors that led it to believe they were reliable, and the creditor had obtained a credit report, the creditor's reliance could not be deemed unreasonable. *Id.* at 1166–67.

address creditor abuse."[25] When courts have found a creditor did not reasonably rely on a debtor's falsehoods, they have generally highlighted numerous red flags the creditor willfully ignored.[26]

Looking to the congressional history of § 523(a)(2)(B) and the widely-held understanding that the Bankruptcy Code is meant to protect the "honest but unfortunate debtor," we agree with our sister circuits that the reasonable reliance requirement is a low hurdle for creditors to satisfy. The requirement is primarily meant to target bad-faith creditors who ignore red flags with the knowledge that they can later avoid the debtor's discharge under § 523(a)(2)(B).

Here, Veritex argues that the bankruptcy court erred in finding that it did not reasonably rely on Osborne's materially false written statement: the 2012 and 2013 personal financial statements. Osborne, meanwhile, argues that the district court erred in holding that his wife's intent to deceive could be imputed to him. Both the initial 2012 loan and the 2014 loan renewal will be discussed in turn.

### 1. Initial 2012 Loan

Veritex first argues that the district court erred when it found Osborne did not intend to deceive the bank upon first applying for a loan when he did

---

[25] *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1764 (2018). The Court in that case assessed § 523(a)(2)(B) in the context of what a "statement respecting the debtor's financial condition" entailed. *Id.* at 1757.

[26] *See, e.g., Colombo Bank v. Sharp (In re Sharp)*, 340 F. App'x 899, 908 (4th Cir. 2009) (per curiam) (unpublished) (upholding bankruptcy court's finding that the sophisticated creditor's reliance was unreasonable because it relied on stale and irregular documents and made no independent inquiry of debtor's title, despite primary purpose of title report to verify the borrower's representations); *In re Morris*, 223 F.3d 548, 553–54 (7th Cir. 2000) (district court did not err in finding creditor did not reasonably rely after creditors all admitted to not believing representations in debtor's affidavits but not investigating further); *First Bank of Colorado Springs v. Mullet (In re Mullet)*, 817 F.2d 677, 678 (10th Cir. 1987) (no clear error in finding lack of reasonable reliance after debtor's creditor report revealed inconsistencies and omissions that the creditor did not investigate) (*abrogated on other grounds by Field v. Mans*, 516 U.S. 59 (1995)).

not update his 2012 financial statement to reflect his personal guarantee of the lease with PMC. Regardless of whether the PMC lease was finalized when Osborne submitted his 2012 financial statement, Veritex contends, he had a continuing obligation to update it to reflect any material change.

"Reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation may combine to produce the inference of intent [to deceive]."[27] In the context of fraudulent intent under § 523(a)(2)(B), we have held that "[i]f the bankruptcy judge finds one version of events more credible than other versions, this Court is in no position to dispute the finding."[28]

The evidence showed that the financial statement Osborne submitted on August 3, 2012, was accurate as of that date. It became inaccurate when Osborne did not update the statement as required to reflect his guarantee of the PMC loan. The bankruptcy court found that Osborne "seemed to have a sense of detachment about his financial statements" and thus "his intent at that time [did not rise] to the level of either intent to deceive or even reckless disregard for the truth." The bankruptcy court did not clearly err in its finding that Osborne acted without dishonest intent at the time of the initial loan. Because the record supports this finding, we need not address whether the bankruptcy court erred in finding that Veritex did not reasonably rely on Osborne's 2012 statement.

## 2. 2013–14 Loan Renewal

Veritex next argues that the bankruptcy court clearly erred in finding that it did not reasonably rely on Osborne's 2013 personal financial statement

---

[27] *In re Norris*, 70 F.3d 27, 30 n.12 (5th Cir. 1995) (quoting *Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 305 (11th Cir. 1994)).

[28] *Id.* at 31 (5th Cir. 1995) (brackets removed) (quoting *First National Bank LaGrange v. Martin (In re Martin)*, 963 F.2d 809, 814 (5th Cir. 1992)).

that Karen provided Veritex as part of the Osbornes' request for a renewed loan.[29] We agree.

The bankruptcy court first addressed the reasonableness of Veritex's reliance when Osborne initially requested a loan extension. Looking to the first factor in *Coston*, the bankruptcy court observed that the two parties had no preexisting relationship that would have lulled Veritex into a sense of trust. The evidence showed, however, that Osborne and Veritex had built up a working relationship over the previous thirteen months. Indeed, Osborne had a reputation as a well-respected cardiologist within the community, and he had been forthcoming about SOTHC's financial struggles.[30] These dealings, coupled with his reputation as a superbly well-trained cardiologist, demonstrate that Veritex had reason to trust Osborne at this stage in their dealings.

Next, the bankruptcy court criticized Veritex for relying on the financial statement Karen provided because it was not on Veritex's own form and was unsigned. Veritex, however, showed that it followed its standard practice in extending the loan.[31] For example, it provided uncontroverted evidence that clients were not required to use the bank's own forms when providing financial statements, and that clients used their own forms fifty percent of the time.

---

[29] On appeal, Osborne does not challenge the bankruptcy court's finding that the omission of the PMC lease default was done with the intent to deceive. Instead, Osborne argues that Karen's fraudulent intent may not be imputed to him, and that regardless, the bankruptcy court erred in finding that she was his agent. Both issues are discussed in Section II, Part B of this opinion.

[30] The record reflects that Osborne was an accomplished doctor who had also obtained a Ph.D. Osborne did his postdoctoral at Harvard, where he published numerous articles. In 2003, the American Heart Association named him the Cardiac Care Provider of the Year. He also taught at numerous universities throughout his career. In addition, Osborne gave public talks, which generated significant speaking fees.

[31] *See In re Young*, 995 F.2d 547, 549 (5th Cir. 1993) (observing "uncontroverted testimony that the relevant practice in the industry was to rely solely on the documentation presented by the applicant" in finding that the creditor reasonably relied).

Additionally, no law or evidence suggests that a lack of a signature on a financial statement should be considered a red flag; § 523(a)(2)(B) does not require the written statement be signed, and Veritex established it was within bank protocol to accept a document without a signature.

Finally, the bankruptcy court found that the financial statement listed no contingent liabilities—including the Osbornes' guarantee of the Veritex loan—and that Wood approved the statement after being alerted to this absence. It is reasonable, however, that Veritex would not have been alarmed by this, because this was its loan—the Osbornes' personal guarantee of the SOTHC loan was therefore well-known by all parties.[32] The record showed Wood understood the report to have a lower level of detail but did not believe this one omission required further inquiry. Veritex provided uncontested evidence that it had no reason to believe the Osbornes would have *other* contingent liabilities, and that regardless, Osborne's 2012 agreement required that he update his financial statement with any material changes. Thus, the sole omission of the SOTHC loan did not make Veritex's reliance unreasonable.

In finding Veritex's reliance unreasonable, the bankruptcy court also highlighted alleged red flags that existed when Veritex finally renewed the loan in March 2014. First, it stressed that Veritex knew SOTHC was struggling and was relying primarily on the Osbornes' guarantee for repayment. The court also recognized that SOTHC was losing money, and Osborne was funding its losses with loans. It additionally noted that SOTHC's financial statements for the medical equipment rental expenses showed that the 2013 profit and

---

[32] *See In re Norris*, 70 F.3d 27, 30 (5th Cir. 1995) (affirming bankruptcy court's finding that a financial statement's "only obvious substantial error . . . was one of which the bank already was aware" and "that the flawed financial statement was 'not such a 'red flag' as to invoke a duty to investigate'").

loss (P&L) statement was presented on an accrual basis, whereas the first quarter of the 2014 P&L statement was on a cash basis.

These red flags, however, spoke to the soundness of Veritex's decision to extend the loan to SOTHC rather than dishonesty by Osborne.[33] The bankruptcy court was correct that Veritex was struggling and unable to service the loan. It is clear from the record, however, that Veritex, in extending the loan, was relying on Osborne's personal guarantee. The fact that SOTHC's financial statements showed Osborne's practice was in financial trouble would not have alerted Veritex to the possibility that Osborne was lying on his personal financial statement. If anything, it showed that Osborne was upfront about any financial struggles SOTHC was facing. As to the P&L statement, to the untrained eye this could give an inflated sense of SOTHC's cash flow after paying its expenses. But Veritex understood that SOTHC was struggling and unable to meet its expenses. In any event, this related more to the condition of SOTHC rather than the ability of Osborne to personally guarantee the loan.

Finally, the bankruptcy court found Veritex's reliance to be unreasonable because the Osbornes' September 2013 financial statement on which it relied was seven months old, and a minimal amount of investigation would have revealed the Osbornes' deceit.[34] Yet the record illustrates that Veritex did not

---

[33] *See, e.g., Fulton, N.A. v. Robbins (In re Robbins)*, 562 B.R. 83, 109 (Bankr. E.D. Pa. 2016) (("[T]he reasonableness issue under § 523(a)(2)(B) is *not* whether it was reasonable for the Plaintiff to have invested in the Debtor's business, but whether it was reasonable for [it] to have relied upon the Debtor's statements . . . without making further inquiries before deciding to invest.") (citation omitted); *First State Bank of Munich v. Braathen (In re Braathen)*, 364 B.R. 688, 701 (Bankr. D.N.D. 2006) ("The issue of reasonableness presented under section 523(a)(2)(B) is not whether it was reasonable for the Bank to have loaned the Debtor money, but whether it was reasonable for the Bank to have relied upon his statement . . . in extending him credit.").

[34] The bankruptcy court understood the September 2013 financial statement as provided for the initial sixty-day extension. This is incorrect. The record shows Veritex extended the loan on September 13, 2012, so that it would not go into default while the bank decided whether or not to extend the loan another year; the Osbornes provided the financial statement on September 27, 2013, as part of its loan renewal request.

blindly renew Osborne's loan in bad faith. Although the financial statement was not current, Veritex did follow up on the statement, further inquiring into the Osbornes' personal financial statement and SOTHC's financial records months later.[35] Moreover, Veritex was entitled to accept Osborne's promise to update the financial statement with any material changes. In addition, Veritex obtained a credit report on Osborne after the judgment by confession was entered, which failed to reveal the judgment against him and showed his credit score had actually gone up two points since August 2012 (from 710 to 712). The credit report and further email inquiries demonstrate that a "minimal amount of investigation" would not have uncovered Osborne's deceit.

It is clear that Veritex investigated the Osbornes' loan request for months before reaching its decision. For example, in Wood's 2014 loan presentation to the bank loan committee, he explained that he had met with the Osbornes in December 2013 to discuss the loan extension. His report reasoned that SOTHC had run into bad luck in its first year of operation; Karen, who was going to oversee the practice, had been diagnosed with cancer, and SOTHC's two office managers "proved to be less than capable and reliable."[36] Wood reported that Karen's father had since been brought in to assist with the business. Karen's father had many years of experience helping troubled businesses, and he had previously provided up-to-date financial statements and completed certifications and billings. Wood also knew that Osborne earned annual speaking fees of $325,000, which could help support SOTHC. And again, Osborne's credit score made no reference to a judgment

---

[35] For example, in one email dated December 27, 2013, Wood told Karen Osborne and her father that a caveat to the loan renewal was that Veritex would "need to confirm the Osborne's [*sic*] personal liquidity during this renewal process." He also asked for clarification on the information provided on the Osbornes' income statements.

[36] Medicaid and Medicare certification billing, staff certification for insurance billings, and up-to-date financial information all suffered as a result.

against him in Pennsylvania. Veritex's efforts show that it did not idly ignore red flags, and help demonstrate that "even minimal investigation" would not have "revealed the inaccuracy of the debtor's representations."[37]

We conclude that Veritex exercised reasonable diligence in evaluating the Osbornes' financial condition before renewing the loan. The fact that SOTHC was ultimately unable to service the loan did not make Veritex a bad faith lender. The record is clear that Veritex looked to Osborne to guarantee the loan, and it relied heavily on his financial statement. The alleged red flags were not significant enough to alert Veritex to Osborne's dishonesty. The bankruptcy court erred in focusing on the soundness of the loan to SOTHC rather than the truthfulness of Osborne's representations.

## B. Imputation of Fraudulent Intent under § 523(a)(2)(B)

Veritex asserts that the bankruptcy court correctly determined that Karen's intent to deceive could be imputed to Osborne, thereby satisfying the requisite intent under § 523(a)(2)(B)(iv). Osborne, however, contends the bankruptcy court erred in concluding that his wife Karen could act as his agent when she submitted the 2013 financial statement as part of their loan renewal request. First, Osborne contends that § 523(a)(2)(B)(iv) requires that the fraudulent statement be one "that the *debtor* caused to be made or published with intent to deceive," and thus a fraudulent statement by a debtor's partner or agent may not be imputed to the debtor.[38] Second, he argues the bankruptcy court erred in finding that Karen actually was his agent when she submitted the 2013 financial statement.

We have held that fraud of one partner may be imputed to an agent or partner for determining dischargeability under § 523(a)(2)(A), which provides

---

[37] *In re Coston*, 991 F.2d 257, 261 (5th Cir. 1993) (en banc) (per curiam).
[38] 11 U.S.C. § 523(a)(2)(B) (emphasis added).

an exception to discharge from any debt made under false pretenses other than a written statement respecting the debtor's financial condition.[39] In *In re Luce*, this court held that a husband's fraud could be imputed to his wife under § 523(a)(2)(A) because his wife was a partner in the business, she made misrepresentations while acting on behalf of the partnership, and she shared in the monetary benefits of the fraud.[40]

Although this court has not yet addressed whether fraud may be imputed to another for determining dischargeability under § 523(a)(2)(B), Supreme Court law points in that direction. In 1885, the Court in *Strang v. Bradner* held that a partner's fraud can be imputed to a debtor to make a debt non-dischargeable under the predecessor statute to § 523(a)(2).[41] The 1978 Bankruptcy Reform Act shows that Congress did not intend to dramatically alter existing bankruptcy law when it enacted § 523(a)(2)(B).[42] The Court has also stated that "if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific."[43] It has "followed this rule with particular care in construing the scope of bankruptcy codifications."[44] Thus, nothing suggests Congress sought to circumvent

---

[39] *Luce v. First Equipment Leasing Corporation (In re Luce)*, 960 F.2d 1277, 1282 (5th Cir. 1992) (per curiam). The court in *Luce* cited approvingly *Fluehr v. Paolino (In re Paolino)*, 75 B.R. 641, 649 (Bankr. E.D. Pa. 1987), which held that "if husband acted as wife's agent within the scope of the agency relationship, then the agent's fraud could be imputed to the principal under § 523(a)(2)." *In re Luce*, 960 F.2d at 1282 n.6.

[40] *In re Luce*, 960 F.2d at 1283. In *Deodati v. M.M. Winkler & Assocs. (In re M.M. Winkler & Assocs.)*, 239 F.3d 746, 751 (5th Cir. 2001), we clarified that one does not have to share in the monetary benefits of the fraud, holding "if a debt arises from fraud and the debtor is liable for that debt under state partnership law, the debt is nondischargeable under § 523(a)(2)(A)."

[41] 114 U.S. 555, 561 (1885).

[42] S.Rep. No. 95-989, 2d Sess. at 78 (1978) (noting that § 523(a)(2) is "modified only slightly from current section 17a(2)"); H.R.Rep. No. 95-595, 1st Sess. at 364 (1977) (same).

[43] *Kelly v. Robinson*, 479 U.S. 36, 47 (1986) (quoting *Midlantic National Bank v. New Jersey Dept. of Environmental Protection*, 474 U.S. 494, 501 (1986)).

[44] *Id.*

*Strang*.[45] Furthermore, this court in *In re Luce* endorsed *Strang* when holding a partner's fraud could be imputed to a debtor under § 523(a)(2)(A).[46] It would be anomalous for us to now hold that fraud can be imputed to an innocent partner or agent under § 523(a)(2) *unless* that fraud happens to be in the form of a written statement.[47] We therefore hold that a fraudulent statement by a debtor's partner or agent may be imputed to the debtor under § 523(a)(2)(B).

Osborne next argues that the bankruptcy court erred in finding that Karen was his agent. An agency relationship based on actual authority arises when "the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act."[48] An agency relationship based on apparent authority is formed "when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations."[49] The bankruptcy court found that Karen was Osborne's actual and apparent agent.[50]

The record supports the court's finding. Osborne directed Karen to manage their personal financial affairs, and she had the authority to prepare their 2013 financial statement because she prepared their 2012 financial statement that he signed. Karen also worked with Wood in securing the loan renewal. Osborne cites numerous cases holding that marriage alone does not

---

[45] *See Federal Dep. Ins. Corp. v. Calhoun (In re Calhoun)*, 131 B.R. 757, 762 (Bankr. D.D.C. 1991) ("There is no evidence that Congress intended to abandon *Strang v. Bradner* in enacting § 523(a)(2)(B).").

[46] 960 F.2d 1277, 1282 (5th Cir. 1992) (per curiam).

[47] *See, e.g., In re Calhoun*, 131 B.R. at 762 ("[I]t would be anomalous to allow imputation of fraud for purposes of § 523(a)(2)(A) but not for § 523(a)(2)(B)."). *See also In re Paolino*, 75 B.R. 641, 646–47 (Bankr. E.D. Pa. 1987) (holding that an agent's fraud may be imputed to a partner under § 523(a)(2)).

[48] RESTATEMENT (THIRD) OF AGENCY § 2.01 (2006).

[49] *Id.* § 2.03.

[50] The district court, affirming the bankruptcy court's conclusion that Veritex did not reasonably rely, never reached this issue. *Veritex Cmty. Bank v. Osborne*, No. 4:18-CV-00129-O, 2019 WL 1382646, at *2 n.1 (N.D. Tex. Mar. 27, 2019).

create an agency relationship, but the record shows that Karen was more than just Osborne's wife—she oversaw SOTHC's day-to-day finances. The bankruptcy court thus did not err in finding Karen was Osborne's agent.

### III.  CONCLUSION

Based on the foregoing, the district court's judgment is reversed and rendered. The bankruptcy court's finding that Veritex did not reasonably rely on Osborne's 2013 financial statement is clearly erroneous, and Osborne is not entitled to be discharged from his debt to Veritex.

REVERSED AND RENDERED.